**CONOCO, INC., Appellant,**

v.

**FORTUNE PRODUCTION CO., Tucker Drilling Co., Inc., Curtis Hankamer Corp., and John L. Cox, Appellees.**

No. 01–97–00547–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 29, 1998.

Randall W. Wilson, Eric Fryar, Houston, for Appellant.

Eileen O'Neill, William H. Young, Houston, for Appellee.

Panel consists of Chief Justice SCHNEIDER and Justices TAFT and PRICE.*

\* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas

## OPINION

TAFT, Justice.

This appeal arises from a dispute about natural gas contracts. Appellees, Fortune Production Co. (Fortune), Tucker Drilling Co., Inc. (Tucker), Curtis Hankamer Corp. (Hankamer), and John L. Cox sued appellant, Conoco Inc. (Conoco), for breach of contract, fraud in the inducement, reformation, conversion, and unjust enrichment. In accordance with the jury's verdict, judgment was rendered against Conoco for $894,673 in unjust enrichment damages plus prejudgment interest. We address whether: (1) the trial court erred in allowing appellees to recover for unjust enrichment; (2) the trial court abused its discretion in permitting appellees to amend their petition to allege unjust enrichment after the parties had rested and the evidence was closed; (3) the evidence was legally and factually sufficient to prove that Conoco unjustly received benefits; (4) the trial court erred in refusing to disregard the jury's answer to the question on ratification and in rendering judgment that the appellees take nothing on their fraud claim; and (5) the trial court erred in refusing to disregard the jury's finding of fraud damages. We affirm.

### Facts

Appellees, who are oil and gas producers, brought this suit as representatives for the interest owners in certain West Texas gas wells. Since 1975, those wells have been under contract to supply gas to the Concho Valley Gas System. This system was initially formed by the efforts of appellees and one of Conoco's predecessors, Farmland, to maximize the advantages of the unregulated intrastate gas market. For the system to be worth building, Farmland required (1) a gas supply and (2) a long-term customer. Appellees committed their gas, and Lone Star Gas Company (Lone Star) became the

at Houston, participating by assignment.

principal customer. Appellees' gas was dedicated to the Lone Star/Farmland contract under its terms of dedication, and appellees entered into gas purchase contracts with Farmland entitling them to a percentage of the Lone Star contract price.[1] The price was paid "at the wellhead," which means it was determined according to the MMBtu (the heating value) of the gas at the point it was extracted from the ground. The contracts varied in the length of their primary term, but continued in effect during the entire time Farmland operated the system.

In the late 1980's, Enerfin purchased the system from Farmland. No changes were made in the method or manner of payment to appellees. In 1989, Tucker entered into two contracts with Enerfin which entitled Tucker to payment based upon the Lone Star contract. In August 1989, Conoco purchased the system from Enerfin and succeeded to the benefits and obligations of the Enerfin contracts. The market for gas had decreased significantly below the price Lone Star was committed to paying. Immediately upon its takeover, Conoco gave notice of termination of all of appellees' contracts except the two Enerfin contracts.

At the same time, Conoco began negotiations with appellees for renewal contracts. David Lugar, Conoco's gas buyer, proposed that the new contracts be made "to facilitate efficient contract administration and accounting." He also advised appellees in his letter that Conoco wished to change to a "percent of proceeds" type of contract. A percent of proceeds contract is one under which a gas supplier, rather than being paid at the wellhead, is paid a share of the price paid by the ultimate consumer for the two finished products: hydrocarbon liquids and residue gas.[2] Consistent with Lugar's representations that Fortune would receive a share of the price for which it sold the liquids and residue gas "attributable" to Fortune's gas, the proposed contract attached to his letter contained two pricing provisions: one for gas and one for liquids. The residue gas pricing provision included language indicating the gas would be sold on the spot market[3] and paid at market price.

Appellees were upset with the new contracts proposed by Conoco, which appeared to deprive them of any share of the Lone Star contract price. Appellees believed that Lugar's representations that appellees would be paid a percent of the proceeds Conoco received for the sale of their gas entitled them to the higher Lone Star contract price. Appellees contend that when they inquired about the lack of any reference to the Lone Star contract price they were told their gas could no longer be sold to Lone Star and it would be sold on the spot market. Conoco admitted that it did not intend to pay appellees a share of the Lone Star Contract Price, as opposed to market price, but denied that it lied to appellees about whether the gas would be sold to Lone Star. Believing they would receive a percentage of the price Conoco obtained for their gas, and understanding the gas could only be sold at market price, appellees either signed written agreements (Fortune and Tucker) or continued to supply their gas to the system without benefit of a written contract (Hankamer and Cox).

The written contracts became effective in October of 1990.[4] Beginning that date,

1. The Lone Star contract obligated Lone Star to purchase a minimum of 55,000 mcf (thousand cubic feet) per day of gas at a price of $3.50 for a period of 20 years.

2. The letter from Lugar to Fortune, the largest producer among appellees, provided: "The contract proposes to return to Fortune Production, seventy-five percent (75%) of the liquid revenue and seventy-five percent (75%) of the residue gas revenue attributable to gas produced and delivered to Conoco."

3. The "spot market" price was approximately $1.25 per mcf while the Lone Star contract paid $3.50 per mcf.

4. Fortune and Tucker had written contracts with Conoco in 1990 and 1992. Hankamer had a written contract in 1990, but not 1992.

Conoco took appellees' production and sold the residue gas to Lone Star. Conoco paid appellees a share of the market price rather than the actual price it received from Lone Star. Although Tucker's Enerfin contracts contained language that undisputedly entitled it to be paid based on the Lone Star contract price, Conoco paid Tucker only a percentage of market price even on those contracts.[5] The 1990 contracts were replaced in 1992 with substantially similar contracts.

With respect to the liquids, Conoco initially paid appellees a share of the proceeds received for the sale of all liquids compressed and processed out of their gas. In January of 1991, Conoco began keeping all of the profits from liquids compressed out of the gas stream in the field, and only paid appellees a share of the revenue from liquids obtained within the processing plants themselves. Appellees indicated that Conoco never advised them of this change. Conoco discussed the change internally for months after it was made. Eventually, Conoco established a new accounting code to which it attributed all of the field liquid volumes. Appellees contend that the new accounting code was established to hide the discrepancy between the total liquid volumes reported on Conoco's plant production reports and the lesser volumes being reported to appellees on their payment statements. Conoco contends that the contract did not include any component for field liquids and, therefore, they were entitled to keep them.

In 1992, Wes Green of Fortune noted discrepancies in Fortune's liquids payments. When he attempted to audit Conoco's supporting data, he met some resistance. In particular, Conoco would not allow Fortune's consultant to participate in the review. Eventually, after reviewing the plant production statement, Green learned there was an underallocation of liquids. He ultimately determined that Conoco was producing between 30,000 to 90,000 barrels of liquids per month that it was not allocating system-wide. In 1992 or the early part of 1993, Gary Howard, a Lone Star employee, visited Wes Green's office at Fortune. Howard told Green that Conoco had been selling Fortune's gas to Lone Star all along. Howard gave Green dedication reports showing that Fortune gas had always remained dedicated to the Lone Star contract price.

Appellees then filed suit alleging claims for both the residue gas and the field liquids. The case was tried to a jury. The jury found that Conoco committed fraud against appellees and awarded $4,605,416 in damages. The jury also found that appellees ratified the contracts and, therefore, the trial court entered a take nothing judgment on the fraud claim. However, the jury also found Conoco was unjustly enriched by failing to pay appellees their percentage of field liquids and awarded $894,673 in damages. Appellees moved to disregard the ratification finding and Conoco moved to disregard all other answers except ratification. The trial court denied both parties' motions and rendered judgment in favor of appellees on the unjust enrichment claim, but denied appellees their fraud recovery based on the jury's contract ratification finding.

### Unjust Enrichment

#### A. Availability

In its first point of error, Conoco contends the trial court erred in permitting appellees a recovery for unjust enrichment. Conoco argues the claim for unjust enrichment is available only when there is no contract, but in this case written contracts existed between the parties. Appellees contend that (1) Conoco waived this

---

Cox never had a written contract with Conoco. Nevertheless, both Cox and Hankamer continued to sell their gas to Conoco and Conoco continued to pay the spot price for the gas.

**5.** The jury awarded Tucker $302,797 in damages for Conoco's breach of these contracts.

defense by failing to request a jury question on its contractual defense and (2) assuming the defense was not waived, the contracts at issue do not control the issue of payment for field liquids and, therefore, do not preclude appellees' equitable claim.

## 1. Waiver

We believe the waiver issue is controlled by *Freeman v. Carroll*, 499 S.W.2d 668 (Tex.Civ.App.—Tyler 1973, writ ref'd n.r.e.). In that case, the defendant contended that there was a valid express contract and, therefore, there could be no recovery for quantum meruit. *Id.* at 670. The defendant did not request special issues raising the question of an express contract, the existence of which was defendant's basic defense. *Id.* The court held the defendant had the burden to request the proper issue inquiring into his affirmative defense. *Id.*

Here, there is no doubt of the existence of express contracts between appellees and Conoco, but there is a dispute as to whether there was a meeting of the minds pertaining to the treatment of the field liquids under the terms of the express contracts. According to *Freeman*, if there is a question as to whether there is a meeting of the minds under the contracts, then appellees can argue unjust enrichment in the alternative and recover under that theory. *Freeman*, 499 S.W.2d at 670.

Although appellees pleaded the existence of written contracts and introduced the contracts into evidence, it was incumbent upon Conoco to obtain findings concerning the validity of the contracts in order to secure its defense. According to *Freeman*, had Conoco submitted this issue to the jury and had the jury found the existence of express contracts pertaining to treatment of field liquids, a recovery for unjust enrichment would have been precluded. *Id.* Because Conoco did not secure a jury finding that the contract governed the treatment of field liquids, it is prevented from arguing on appeal that the contracts bar appellees' equitable recovery.

## 2. Merits

Conoco contends recovery for unjust enrichment is unavailable when, as here, there is a valid contract covering the subject matter. Conoco directs this Court to *Inglish v. Prudential Ins. Co.*, 928 S.W.2d 702 (Tex.App.—Houston [1st Dist.] 1996, writ denied), for the proposition that unjust enrichment claims are precluded if the parties have entered into express contracts. In *Inglish*, this Court articulated the rule as follows:

> As with claims for quantum meruit, unjust enrichment claims are predicated on the absence of an express contract controlling the circumstances. Here, an express contract controls the amount of the premium. Consequently, the equitable remedy of unjust enrichment is not available, and the trust's evidence did not raise a fact issue regarding that claim.

*Inglish*, 928 S.W.2d at 706. The unjust enrichment doctrine applies the principles of restitution to disputes which, for one reason or another, are not governed by a contract between the contending parties. *R. Conrad Moore & Assoc. v. Lerma*, 946 S.W.2d 90, 96 (Tex.App.—El Paso 1997, writ denied). The purpose of the unjust enrichment doctrine is to protect those parties who may not have reached a contract or whose contract is invalid. However, the existence of an express contract does not preclude recovery in quantum meruit for the reasonable value of services rendered and accepted which are not covered by the contract. *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex.1976). Moreover, when an express contract is silent as to some point or matter, recovery may then be had on an implied contract. *Hoffman v. Deck Masters, Inc.*, 662 S.W.2d 438, 441 (Tex.App.—Corpus Christi 1983, no writ).

Here, appellees alleged in their second amended petition that Conoco had

been unjustly enriched because Conoco extracted liquids from the gas stream and sold the liquids without paying appellees for their liquids. The record reflects the contracts at issue contain no terms controlling the payment for the field liquids. Therefore, the rule precluding unjust enrichment recovery when a valid contract exists is inapplicable. See *Inglish*, 928 S.W.2d at 706 (holding that unjust enrichment claims are predicated on the absence of an express contract *controlling the circumstances*). Conoco's claim of contractual entitlement to all of the field liquids revenue was apparently based not on an express provision in the gas contract that gives them such liquids free of charge, but on the purported absence of a provision requiring them to pay for them. Here, Conoco took title to all of appellees' production at the wellhead but paid them for only a portion of that production on the grounds that the contracts were silent as to the rest. Unjust enrichment is precisely the equitable remedy to address this situation.

Conoco directs this Court to *Trans-American Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591 (Tex.App.—San Antonio 1996, writ denied). *In Finkelstein*, the court noted that unjust enrichment characterizes the result of failing to make restitution for benefits received under circumstances giving rise to an implied or quasi-contract. *Id.* at 600. The court also noted there can be no recovery "if the same subject is covered by an express contract," stressing the fact that the parties were sophisticated. *Id.* The court concluded that the plaintiff was precluded from recovering for unjust enrichment because the plaintiff agreed to the contract. *Id.* In our case, however, the contracts at issue do not provide for the payment of field liquids and therefore do not cover the subject matter sued upon. We therefore conclude that, under the facts of this case, the *Finkelstein* holding is not controlling.

We hold that unjust enrichment was available to appellees. Accordingly, we overrule Conoco's first point of error.

## B. Trial Amendment

In its second point of error, Conoco contends the trial court abused its discretion in permitting appellees to amend their petition, to allege unjust enrichment, after the parties had rested and the evidence was closed. Specifically, Conoco contends that it presented evidence of surprise and prejudice and that appellees asserted a new cause of action, making the amendment prejudicial on its face.

It is well established that a party may amend its pleadings after verdict but before judgment. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 940 (Tex. 1990). Rule 63 provides in part:

Parties may amend pleadings, ... as they may desire by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party; provided, that any pleadings, responses or pleas offered for filing within seven days of the date of trial or thereafter, ... *shall* be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party.

Tex.R. Civ. P. 63 (emphasis added). Rule 66 further provides:

If evidence is objected to at the trial on the ground that it is not within the issues made by the pleading, or if during the trial any defect, fault or omission in a pleading, either of form or substance, is called to the attention of the court, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment

would prejudice him in maintaining his action or defense upon the merits.

Tex.R. Civ. P. 66.

 Whether to allow the filing of a trial amendment is within the sound discretion of the trial court. *Zavala v. Trujillo,* 883 S.W.2d 242, 245 (Tex.App.—El Paso 1994, writ denied). The burden of showing surprise or prejudice rests on the party resisting amendment. *Southwestern Bell Mobile Sys. v. Franco,* 951 S.W.2d 218, 227 (Tex.App.—Corpus Christi 1997), *aff'd in part, rev'd in part on other grounds,* 971 S.W.2d 52, 41 Tex. Sup.Ct. J. 930 (June 5, 1998). The test for abuse of discretion is not whether, in the opinion of this Court, the facts present an appropriate case for the trial court's actions, but whether the court acted without reference to any guiding rules and principles. *Zavala,* 883 S.W.2d at 245.

Conoco cites no cases in which an appellate court reversed a trial court's judgment for an abuse of discretion in *allowing* a trial amendment. Cases cited by Conoco define when a trial court *may refuse* an amendment, not when it *must refuse* an amendment. *See, e.g., Stephanz v. Laird,* 846 S.W.2d 895, 901 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

Here, appellees' trial amendment did not alter their claims in any material respect. The facts asserted by appellees were the same as those contained in their original and first amended petition.[6] The underlying allegations—that Conoco took possession of appellees' gas and sold the field liquids compressed from that gas without paying them—did not change with the filing of the trial amendment.

Therefore, we conclude that the trial court did not abuse its discretion in allowing the trial amendment.

---

6. Appellees sued Conoco for conversion of the same subject matter. Appellees' first amended petition, which was filed several months prior to trial, provided "with respect to the payment for liquids, plaintiffs would assert that defendant's practice of applying plant

We overrule Conoco's second point of error.

## C. Sufficiency of the Evidence

 In its third point of error, Conoco challenges the legal and factual sufficiency of the evidence to establish unjust enrichment.

In reviewing legal insufficiency points, we consider only the evidence and inferences that tend to support the finding, and disregard all evidence and inferences to the contrary. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). If there is any evidence of probative force to support the finding, the point of error must be overruled. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex. 1988); *U.S. Marine Corp. v. Kline,* 882 S.W.2d 597, 600 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Evidence may not be found insufficient unless a vital fact may not reasonably be inferred from the facts proved in the particular case. *Cannon v. ICO Tubular Servs.,* 905 S.W.2d 380, 386 (Tex.App.—Houston [1st Dist.] 1995, no writ).

When examining factual insufficiency points, we must examine all of the evidence. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); *Klekar v. Southern Pac. Transp.,* 874 S.W.2d 818, 827 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Under factual sufficiency points, the finding can only be set aside if it is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Lofton,* 720 S.W.2d at 805; *Klekar,* 874 S.W.2d at 827.

Conoco argues there is no evidence, or insufficient evidence, to support the jury's answer to question No. 3, which provided:

processes to the pipeline supplying the subject processing plants, extracting liquids from the gas stream by such plant processes ... and selling such at the tailgate of the plant, with no compensation to plaintiffs ... constitutes conversion of plaintiffs' liquids."

Was Conoco, Inc. unjustly enriched as a result of failing to pay the plaintiffs their percentage of field liquids?

You are instructed that "unjust enrichment" is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.

Answer "Yes" or "No":

The jury responded "yes."

The record reflects that prior to January of 1991, Conoco agreed to return to appellees 75% of the liquid revenue and 75% of the residue gas revenue attributable to the gas produced and delivered to Conoco. The jury heard testimony from Gillian Tilbury, a Conoco representative, that in January of 1991 Conoco decided to retain the field liquids profits based on its interpretation of the contracts. The evidence reflects that prior to January of 1991, Conoco paid appellees a share of the proceeds received from the sale of all liquids. The jury heard testimony from a representative of one of appellees that appellees were never notified that Conoco was going to stop sharing the proceeds from the sale of liquids. In fact, there was testimony that appellees did not learn about the change in how liquids were being accounted for until after appellees had filed suit.

In addition to the above testimony, the jury reviewed an internal memorandum dated April 1991, prepared by Tilbury, in which Conoco discussed the new payment policy which would result in a discrepancy between total volume of liquids reported for the plants and the lesser volumes paid on appellees' statements. The memorandum provided in part:

Since Conoco has taken over operations of the San Angelo System, the question of what the dividing line is between plant and field condensate has been argued repeatedly but never answered.... It is our understanding that there was a change made in allocating plant condensate volumes to the pro-ducers for February production. The volumes were reported as we have described above. When the plant and field condensate volumes are reported in aggregate on the plant production reports, it is very easy to get confused in differentiating the respective volumes. The possibility exists for a producer to acquire the plant production reports and question why he is not receiving his "fair share" of that volume. In order to correctly report field condensate volumes, I have requested Leah Moore to book all field condensate volumes directly to the [Concho Valley Gas System] not to the plants.

Tilbury agreed that there was a concern within Conoco that because Conoco was going to implement a policy of retaining the field liquids, appellees might become concerned about getting their "fair share." There was also evidence that Conoco implemented a new accounting system, and the jury could have concluded that this new system essentially hid the discrepancy between the total liquid volumes reported on the plant production reports and the lesser volume being reported to appellees. The jury also had access to evidence revealing that Conoco repeatedly discussed its decision on how to handle field liquids with the knowledge that its actions resulted in lower revenues to appellees and greater revenue to Conoco.

Viewed in the light most favorable to the verdict, we conclude this is some evidence that Conoco was unjustly enriched. The evidence was, therefore, legally sufficient to support the jury's finding of unjust enrichment.

Conoco contends the evidence is insufficient because the evidence establishes that it paid appellees the market value for their gas. Although there was testimony by the Conoco representatives that Conoco paid appellees market value for their gas, there was also testimony and evidence that Conoco retained the field liquids without compensation to appellees. Conoco also referred to the testimony of Tilbury in

support of its argument that the practice of excluding field condensate from the calculation of gas prices is common in the industry. Tilbury testified as follows:

Q: Do you know whether or not it's customary in the industry for purchasers of gas like Conoco to *sometimes* not share field condensate? Have you *heard* of that in the industry?

A: Yes, I have *heard* of that in the industry (emphasis added).

On the other hand, the jury heard evidence that Conoco and its predecessor had paid appellees for the field liquids prior to January of 1991.

The jury must have believed the testimony and inferences therefrom offered by appellees. The reviewing court does not pass on the credibility of the witnesses or the weight given their testimony, and it does not interfere with the jury's resolution of conflicts in the evidence. *Southwest Texas Coors, Inc. v. Morales,* 948 S.W.2d 948, 950 (Tex.App.—San Antonio 1997, no writ). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and is free to believe one witness and disregard others. *Id.* We hold the evidence is legally and factually sufficient to support the jury's finding on Question No. 3 that Conoco was unjustly enriched.

We overrule appellant's third point of error.

### Ratification

In their first and second cross points, appellees contend the trial court erred in refusing to disregard the jury's answer to question no. 2 (ratification) and in rendering judgment that appellees take nothing on their fraud claim because (1) the ratification finding is legally immaterial and (2) there was no evidence, or insufficient evidence, to support the jury's finding of ratification. Specifically, appellees contend the jury finding is immaterial because ratification of the contract is not a defense

available to Conoco to defeat appellees' fraud claim.

Appellees contend that Conoco defrauded them out of more than $4.6 million. Appellees contend Conoco represented that it would share with appellees the proceeds it received from its sale of the residue gas processed out of appellees' gas stream. Appellees further contend that Conoco then wrongfully procured contracts tied to a share of "spot market" price and claimed that appellees' gas would only be sold on the spot market. Later, after obtaining the agreements and appellees' gas, Conoco sold the gas to Lone Star and did receive a higher price for the gas. Appellees allege that, contrary to Conoco's representations, Conoco did not pay appellees a share of the revenues it received from the sale of appellees' gas. The jury found that Conoco's conduct constituted fraud but that the contracts were ratified by appellees.

The ratification defense requires intentional ratification with full knowledge of the fraudulent acts, not simply awareness of the rumors. *Texacadian Fuels, Inc. v. Lone Star Energy Storage, Inc.,* 896 S.W.2d 233, 237 (Tex.App.—Houston [1st Dist.] 1995), *judgment vacated by agreement,* 922 S.W.2d 549 (Tex. 1996). An express ratification is not necessary. *Rosenbaum v. Texas Building & Mortgage Co.,* 140 Tex. 325, 167 S.W.2d 506 (1943). Acts done in affirmance of the original contract do not necessarily amount to a waiver of the right to sue for fraud, however. *Id.* In order to constitute ratification of the fraud, appellees would have to do so "not only with full knowledge of the fraud and all material facts, but with the intention clearly manifested of abiding by the contract and waiving all right to recover for deception." *Id.* If the evidence of ratification is controverted, the question is for the trier of fact. *Id.; see also Pitman v. Lightfoot,* 937 S.W.2d 496, 523 (Tex.App.—San Antonio 1996, writ denied) (although ratification may be determined as a matter of law if the evidence is

uncontroverted, when the act or acts of ratification are controverted, the question of ratification must be left to the trier of facts).

## A. Materiality

Appellees contend that the ratification finding is immaterial because (1) appellees are allowed to affirm the fraudulent transaction and sue Conoco for their tort damages and (2) appellees' ratification of a fraudulent *contract* does not constitute ratification of Conoco's fraudulent *conduct*. In support of their argument, appellees direct us to *Herider Farms—El Paso, Inc. v. Criswell*, 519 S.W.2d 473 (Tex.Civ. App.—El Paso 1975, writ ref'd n.r.e.).

In *Herider Farms*, the plaintiff bought a business. *Id.* at 475. The defendant, a manager of the company, also sought to buy the business but was outbid by the plaintiff. *Id.* After the sale, the defendant interfered with the company's lease and lured all but one of its employees away from the business. *Id.* The defendant then went to the plaintiff and offered to buy the inventory and equipment. *Id.* The two entered into an agreement for sale under which the defendant paid the plaintiff $10,000 for the business. *Id.* at 476. The plaintiff subsequently brought suit for damages he suffered as a result of the defendant's tortious conduct. *Id.* The defendant invoked the defense of ratification based upon the plaintiff's voluntary decision, made with full knowledge of the wrongful acts, to enter into the sale agreement and accept payment. *Id.* The trial court granted summary judgment for the defendant. *Id.* at 475. Upon reviewing the evidence, the court of appeals reversed and remanded, holding:

> [W]e do not express an opinion upon the merits of the lawsuit other than to conclude that in this summary judgment proceeding where the burden of proof was upon the defendants as the moving parties to establish a defense as a matter of law, such burden has not been met, the evidence is not conclusive, and

the case must be remanded to the trial Court.

519 S.W.2d at 478–79. Appellees misapply *Herider Farms* in arguing that ratification is immaterial. The court of appeals merely recognized that whether ratification occurred was a material issue for the jury to decide.

In *Texacadian*, this Court reversed and remanded a summary judgment granted under facts similar to *Herider Farms*. In *Texacadian*, the trial court granted summary judgment for the defendants based on three defensive theories, one of which was ratification. Texacadian appealed, arguing the defendants failed to prove there was no issue of material fact regarding the defense of ratification. This Court held that the issue of ratification was material and was controverted in the evidence, so if the trial court granted summary judgment on that basis, it was error. *Texacadian*, 896 S.W.2d at 237. As in *Herider Farms*, evidence of ratification was a material issue for the jury to decide.

Ratification was a disputed issue in this case, as well. The evidence supporting ratification is set out below in our analysis of its sufficiency. The jury's finding of ratification was, therefore, material.

Appellees also contend that they could not ratify Conoco's acts as a matter of law. Appellees direct us to *Rhodes, Inc. v. Duncan*, 623 S.W.2d 741 (Tex.App.— Houston [1st Dist.] 1981, no writ), and *Enserch Corp. v. Rebich*, 925 S.W.2d 75 (Tex.App.—Tyler 1996, writ dism'd by agreement), for the proposition that a party cannot ratify an act not done on its behalf. *Rhodes*, 623 S.W.2d at 744; *Enserch*, 925 S.W.2d at 84. While this is an accurate statement of the law of agency, it has no application in the instant case. In *Enserch*, the court held that actions taken by prior owners were not binding on a subsequent owner, because the prior owners were not agents of the subsequent owners and were not acting on their behalf. 925 S.W.2d at 84. Appellees con-

tend they could not have ratified Conoco's acts because Conoco did not act on appellees' behalf in underpaying appellees. There is no evidence that Conoco was required to act on behalf of appellees. Indeed, Conoco could not have acted on its own behalf and been an agent of appellees under the same contract. Because appellees had no agent acting on their behalf in contracting with Conoco, the jury could properly have found that appellees ratified the contracts.

Accordingly, we hold that ratification was a material issue for the jury to decide.

## B. Sufficiency of the Evidence

■ Here, the jury heard testimony from both Conoco and appellees regarding when the parties learned of the fraud. The jury heard testimony from Wes Green, a Fortune employee, that he learned from a Lone Star employee in December of 1992 or January of 1993 that, contrary to Conoco's representations, Conoco was selling appellees' gas to Lone Star. The jury also heard testimony from Charles Middlekauf, vice-president of finance for Tucker, that he knew from reading the contract that Tucker would not receive the Lone Star gas price and that he had questioned Conoco about the matter prior to execution of the contract in 1990. Howard Green, Sr., a Fortune principal, testified that when he saw the pricing provision of the contract in July of 1990, he immediately became concerned: "My immediate reaction was, 'Hey, what are these people going to try to do? Pay us on the spot market basis rather than on the Lone Star contract that we had been governed under for sometime?' "

Thus, the jury heard conflicting testimony concerning when appellees learned of the fraud and could have concluded that appellees had knowledge of the fraud even before entering into the contracts. Furthermore, there was evidence that appellees tried to get a better price for their gas, but were unable to do so. The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and is free to believe one witness and disregard others. *Morales,* 948 S.W.2d at 950. We hold the evidence is legally and factually sufficient to support the jury's finding of ratification. Accordingly, we overrule appellees' first and second cross points.

Given our disposition of appellees' cross points, it is unnecessary to address appellant's reply points challenging the legal and factual sufficiency of the evidence supporting the jury's fraud finding, and we decline to do so.

## Conclusion

We affirm the judgment of the trial court.