**SOUTHWESTERN ELECTRIC POWER COMPANY, Petitioner,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Respondent.**

No. 96–0684.

Supreme Court of Texas.

Argued Oct. 8, 1997.

Decided March 13, 1998.

Ferd C. Meyer, Jr., Kenneth C. Raney, Jr., Dallas, David E. Keltner, Fort Worth, Michael V. Powell, Margaret Donahue Hall, Morris Harrell, Orrin L. Harrison, III, Thomas S. Leatherbury, Dallas, G. William Lavender, Texarkana, David R. Taggart Shreveport, LA, Harry M. Reasoner, Houston, for Petitioner.

John R. Mercy, Texarkana, Janice G. Barber, Fort Worth, William G. Gooding, Texarkana, Michael A. Hatchell, Tyler, Martin D. Schneiderman, Washington, DC, Victor Hlavink, Norman C. Russell, John L. Tidwell, Texarkana, Molly H. Hatchell, Tyler, for Respondent.

OWEN, Justice, delivered the opinion for a unanimous Court.

Southwestern Electric Power Company (SWEPCO) brought suit to recover alleged overcharges under long-term coal transportation contracts with Burlington Northern Railroad Company. Two theories of recovery were submitted to the jury. One was based on a contractual provision that addressed "gross inequity," and the second theory was based on unjust enrichment. The jury failed to find gross inequity but answered issues favorably to SWEPCO on unjust enrichment. We agree with the court of appeals that the judgment for SWEPCO based on unjust enrichment cannot be sustained. We further hold that the court of appeals did not err in its disposition of SWEPCO's other points of error, and we affirm the judgment of the court of appeals.

**I**

SWEPCO is a public utility company. Two of its electric generating plants, the "Welsh" plant in Texas and the "Flint Creek" plant in Arkansas, are fueled by coal mined in Wyoming. In 1974, SWEPCO entered into a long-term agreement with Burlington Northern for the transportation of coal by rail from Wyoming to these plants. When this agreement was executed, the rates

charged for this transportation were regulated by the Interstate Commerce Commission, and the contract consisted of a two-page letter agreement attached to a tariff. The agreement contains an initial "base cost" rate that has been periodically adjusted under a formula set forth in the contract that is tied to a published index. The contract also contains a clause entitled "Formula Intent" which provides:

It is the intent of [the parties] that the formula described above will compensate [Burlington Northern] for any changes in the cost of transporting SWEPCO's coal tonnages above or below the 1971 base cost level. If any one of the parties should suffer a gross inequity as a result of unusual economic conditions, which result in the formula failing to fairly cover cost changes, such inequities will be resolved by mutual agreement among [the parties]. Pending such agreement, no party shall be relieved of its obligations as outlined in the effective tariff.

A few years after the contract was executed, disputes arose regarding the transportation rates, and litigation ensued. As part of a settlement of that prior litigation, a new contract was executed in 1984 for shipments to the Welsh plant. The 1974 agreement continued to govern shipments to Flint Creek. The 1984 agreement, like the 1974 agreement, provides for periodic adjustment of rates based on a formula, and it also contains a clause entitled "Gross Inequity" that is virtually identical to the "Formula Intent" clause in the 1974 agreement.

In the mid–80's, railway rates were deregulated, and Burlington Northern achieved cost savings. SWEPCO contended that Burlington Northern's rates were increasing under the adjustment clauses of the contracts well in excess of actual costs and sought to renegotiate the rates. When those efforts failed, SWEPCO filed this suit. SWEPCO requested a declaratory judgment to determine the rates that should have been charged under the gross inequity clauses of the contracts, and SWEPCO sued to recover for the amounts it had allegedly overpaid. It also sought a declaratory judgment regarding the determination of future rates.

The case was tried to a jury, which failed to find that SWEPCO suffered "a gross inequity as a result of unusual economic conditions." However, the jury answered "yes" in response to issues submitted on a theory of unjust enrichment and found damages of $100 million. The trial court rendered judgment for SWEPCO based on these findings, but pursuant to a pretrial agreement, the amount of damages and prejudgment interest were limited to a total of $71,663,258. With regard to rates to be charged in the future, the trial court rendered a declaratory judgment that the rates would be set at an amount necessary to compensate Burlington Northern for changes in its costs of transporting coal above or below the base levels specified in the contracts.

Burlington Northern appealed. SWEPCO filed a conditional cross-appeal claiming that it was entitled to a new trial on the gross inequity issue because the trial court had erred in admitting evidence of SWEPCO's financial condition and had erred in excluding certain testimony as a discovery sanction. The court of appeals reversed and rendered judgment that SWEPCO take nothing. *Burlington Northern Railroad Co. v. Southwestern Elec. Co.*, 925 S.W.2d 92 (Tex.App.—Texarkana). The court of appeals reasoned that because the jury had failed to find gross inequity under the contracts, the express provisions of the contract governed the rates to be paid and accordingly, that submission of unjust enrichment to the jury was improper. 925 S.W.2d at 97. The court of appeals also reversed the declaratory judgment regarding future rates and overruled SWEPCO's cross-points regarding the trial court's evidentiary rulings.

For the reasons we discuss below, we affirm the judgment of the court of appeals. We first consider the issues surrounding SWEPCO's unjust enrichment claim.

## II

SWEPCO is correct in its assertion that in some circumstances, overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment. *See, e.g., Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687–88 (1951) (allowing restitution for

excess money held by defendant after selling plaintiffs' cotton harvester pursuant to oral contract); *Bowers v. Missouri, Kan. & Tex. Ry. Co.*, 241 S.W. 509, 510–11 (Tex.Civ. App.—Texarkana 1922, no writ) (allowing restitution for freight charges paid in excess of rates specified in shipping contract); *see also Gulf Oil Corp. v. Lone Star Producing Co.*, 322 F.2d 28, 31–33 (5th Cir.1963) (holding that plaintiff could recover money mistakenly paid in excess of contract price); *Natural Gas Pipeline Co. v. Harrington*, 246 F.2d 915, 921 (5th Cir.1957) (holding that gas company was entitled to restitution of difference between contract rate and price paid under invalid rate order set by regulatory board). SWEPCO complains that the court of appeals held that the existence of a contract precludes all claims for unjust enrichment or restitution. We do not read the opinion of the court of appeals to include such a holding. The court correctly observed that if the contract rates were paid under the transportation agreements, there could be no recovery of "overcharges" under a theory of unjust enrichment. The court reasoned that since the jury failed to find that there was a gross inequity, the rates established by the formulas in the contract were the proper charges.

The court of appeals accurately perceived that SWEPCO's unjust enrichment claim is dependent upon a revision of the contract rates pursuant to the "Formula Intent" and "Gross Inequity" provisions of the transportation agreements. Those provisions are the only contractual mechanism for altering the rates derived under the adjustment formulas.

SWEPCO maintains that even though the jury failed to find in its favor in answering issues based on the gross inequity clauses, the jury nevertheless found that Burlington Northern charged more than it should in answering the unjust enrichment issues. SWEPCO's argument is circular, which becomes apparent when the jury's verdict is analyzed.

SWEPCO's gross inequity claim under the 1974 contract was submitted to the jury as follows:

*QUESTION NO. 1*

Do you find that SWEPCO has suffered a gross inequity as a result of unusual economic conditions resulting in the escalation formula in the Flint Creek Contract (Plaintiff's Exhibit No. 1) failing to fairly cover changes in the Railroads' cost of transporting SWEPCO's coal tonnages from Wyoming to Flint Creek above or below the 1971 base cost level?

The same question was submitted regarding the 1984 contract, and the jury answered "no" to both questions.

The gross inequity issues were followed by an instruction and a series of questions that submitted the unjust enrichment claim:

As you consider Questions 7 through 10, you are instructed that the term "unjust enrichment" means the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.

*QUESTION NUMBER 7*

Did the Railroads receive an unjust enrichment by retaining all or a part of the difference, if any, between the rate actually charged for shipping SWEPCO's coal tonnages from Wyoming to Flint Creek and the rates that should have been charged?

The trial court submitted the same question regarding the 1984 contract. The unjust enrichment issues do not, as SWEPCO now contends, inquire about overcharges under the contracts. The jury was asked only if there was unjust enrichment, as defined in the instruction, based on the difference between what Burlington Northern charged and what it "should have charged." The jury was accordingly asked to determine what it thought Burlington Northern should have charged, not what rate was to be paid under the "Formula Intent" and "Gross Inequity" clauses of the contracts. The jury had already considered those contractual claims and had failed to find that there had been a gross inequity resulting from unusual economic conditions. Because the jury failed to find that SWEPCO had suffered a gross

inequity, the rates established under the contract escalation formulas remained in effect. It is undisputed that SWEPCO paid the rates established in accordance with those formulas. Thus, there were no overcharges under the contracts to support SWEPCO's claim for unjust enrichment. SWEPCO's contention that in answering "yes" to the unjust enrichment issues, the jury found that Burlington Northern Charged more than the contracts permitted cannot be sustained.

■ SWEPCO asserts in the alternative that it is entitled to recover under a theory of "money had and received." However, SWEPCO recognizes that this claim is likewise dependent on its contention that the jury found that there had been overcharges under the contract. As long as the rates SWEPCO paid were the contract rates, there was no "money had" by Burlington Northern that should be returned to SWEPCO. The distinction SWEPCO attempts to draw between its unjust enrichment and "money had and received" theories is thus illusory.

■ We note that in our discussion of the submission of the gross inequity theory to the jury, we are not deciding whether the "Formula Intent" and "Gross Inequity" clauses permit a court to set rates when the parties have failed to agree or whether the clauses are unenforceable agreements to agree. That issue was not before the court of appeals or this Court, and we do not address it. SWEPCO maintained that the effect of the gross inequity clause was a question for the jury to decide, and the jury failed to find for SWEPCO. Accordingly, the rates established under the adjustment clauses were the contract rates, and there were no overcharges that would be recoverable under a theory of unjust enrichment.

### III

SWEPCO contends that it is entitled to a new trial because of the admission of evidence of its financial condition and the exclusion of testimony from a former Burlington Northern officer. We agree with the court of appeals that the judgment should not be reversed on either of these points, but our conclusions are based on grounds that differ from those of the court of appeals. We first address the admission of evidence regarding SWEPCO's financial condition.

This Court has long recognized the potential for undue prejudice in allowing the jury to consider a litigant's financial status. *See Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 675 (Tex.1990); *Texas Co. v. Gibson*, 131 Tex. 598, 116 S.W.2d 686, 687 (1938). Because this evidence is often irrelevant and highly prejudicial, Texas courts historically have been extremely cautious in admitting evidence of a party's wealth. *See, e.g., Wal–Mart Stores, Inc. v. Cordova*, 856 S.W.2d 768, 774 (Tex.App.—El Paso 1993, writ denied); *Murphy v. Waldrip*, 692 S.W.2d 584, 588 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.); *First Nat'l Bank of Amarillo v. Bauert*, 622 S.W.2d 464, 469 (Tex.App.—Amarillo 1981, no writ); *Wilmoth v. Limestone Prods. Co.*, 255 S.W.2d 532, 534 (Tex.Civ.App.—Waco 1953, writ ref'd n.r.e.). There are instances, however, when evidence of this nature is admissible and highly probative. Burlington Northern contends that SWEPCO's financial condition was relevant in determining whether SWEPCO suffered a gross inequity under the terms of the contracts.

Both contracts between SWEPCO and Burlington Northern provide that "[i]f any one of the parties [to this Agreement] should suffer a gross inequity as a result of unusual economic conditions, which result in the escalation formulas failing to fairly cover cost changes, such inequities will be resolved by mutual agreement among [the parties]." Under this express language, three elements must be present: (1) unusual economic conditions, (2) that cause the escalation formula to fail to cover changes in the cost of hauling coal, and (3) this failure must cause one party to suffer a gross inequity or condition of unfairness. *See generally* Marvin O. Young, *Construction and Enforcement of Long–Term Coal Supply Agreements—Coping with Conditions Arising from Foreseeable and Unforeseeable Events—Force Majeure and Gross Inequities Clauses, in* 27A ROCKY MTN. MIN. L. INST. 127, 143 (1982).

In an effort to demonstrate that SWEPCO was financially sound and had suffered no

gross inequity, Burlington Northern introduced charts showing that SWEPCO was more profitable than the average electric utility in the United States and that SWEPCO's earnings exceeded those of other utilities in Texas and Arkansas. Additionally, Burlington Northern's expert witness testified that SWEPCO had a higher bond rating than Burlington Northern and also hypothesized that if SWEPCO were suffering a gross inequity, that would be reflected in SWEPCO's financial condition.

■ Commentators on long-term contracts of the type involved in the present case have opined that a party's financial condition is not relevant to the question of whether one party suffers a gross inequity. *See, e.g.*, Victor P. Goldberg, *Price Adjustment in Long–Term Contracts*, 1985 WIS. L.REV. 527, 541 (1985). Rather, the relevant inquiry is "whether the difference between the contract price and the aggrieved party's next best option is large enough to warrant relief." *See id.* We are in general agreement with that analysis. We are not persuaded that evidence of SWEPCO's overall financial strength was calculated to shed light on gross inequity, and there is no indication that this evidence was relevant to whether there were unusual economic conditions or whether the formulas failed to cover changes in costs.

SWEPCO is a large corporation with substantial net income and a large asset base. A company the size of SWEPCO could be precluded from demonstrating a gross inequity under a particular contract if proof of that inequity depended on the relative economic strength of the contracting parties. It is conceivable that a large company such as SWEPCO could lose tens of millions of dollars under a given contract, yet nonetheless remain a financially strong entity because of substantial returns from other areas of its business.

The question of whether financial strength or ability to pay should bear on gross inequity is particularly troublesome when dealing with a regulated entity. A substantial portion, if not all, of the transportation costs incurred by SWEPCO under these contracts is passed through to SWEPCO's customers as part of a "fuel factor" that is added to customers' electric bills. *See* 16 TEX. ADMIN. CODE § 23.23 (1986). Thus, changes in the cost of coal transportation would have little direct effect on SWEPCO's profitability.

■ However, the error in admitting evidence of SWEPCO's overall financial condition was not harmful in this case because SWEPCO invited that error. SWEPCO was the first to adduce evidence of overall financial condition in an effort to persuade the jury that a gross inequity had resulted. SWEPCO offered evidence that Burlington Northern had enjoyed substantial annual earnings, inferring that those earnings were at least in part due to the excessive rates it charged SWEPCO. An expert for SWEPCO who testified extensively regarding the gross inequity issue was asked by counsel for SWEPCO to describe Burlington Northern's overall financial condition and its profitability:

Q   Tell us, Mr. Crowley, how much money they [Burlington Northern] have put in the pockets of their shareholders, their owners, during this same time period that you have described.

A   Approximately four and a half billion dollars.

Q   That's a "B?"

A   "B." Billion. Yes.

Q   Do I have enough zeroes (indicating)?

A   Do you have nine of them? Okay.

\* \* \*

Q   What did Burlington Northern announce last Thursday that they earned in the third quarter of this year, for three months?

A   "Burlington Northern, Inc., announced Thursday it earned a hundred and fifteen million or $1.18 a share in the third quarter, compared with income of twenty-four million or twenty-one cents a share in the flood effect of 1993 third quarter."

\* \* \*

A   "Revenue and operating income were both third quarter records."

■ SWEPCO "opened the door" regarding the relationship between the financial condition of the parties and whether there had been a gross inequity under the contracts. "A party on appeal should not be heard to complain of the admission of improper evidence offered by the other side, when he, himself, introduced the same evidence or evidence of a similar character." *McInnes v. Yamaha Motor Corp.*, 673 S.W.2d 185, 188 (Tex.1984); *see also Evans v. Covington*, 795 S.W.2d 806, 809 (Tex. App.—Texarkana 1990, no writ) (holding that error in admitting settlement negotiations was invited).

SWEPCO argues that it did not invite error because it adduced evidence of Burlington Northern's financial condition only in response to the cross-examination of its expert by Burlington Northern. The record does not bear out that assertion.

The expert witness called by SWEPCO had been retained by SWEPCO in the past on other rate matters involving Burlington Northern. During this trial, Burlington Northern attempted to discredit SWEPCO's witness during cross-examination with prior criticisms from his own client. In one of the prior rate disputes in which SWEPCO had consulted this same expert, a SWEPCO representative indicated that the rates the expert said Burlington Northern should charge were well below a reasonable rate. These statements were in an internal SWEPCO memorandum that said if Burlington Northern used the rates suggested by SWEPCO's expert, the "railroads would probably go broke."

During re-direct, SWEPCO referred its expert back to the memorandum and asked whether Burlington Northern was in fact "going broke." This was not particularly relevant to what was said in the memorandum because Burlington Northern never actually charged the rates proposed by the expert. The fact that Burlington Northern had not gone broke was thus no indication that it would not have done so if it charged the rates that had been proposed by this witness. In any event, SWEPCO did not limit its questions to whether Burlington Northern was "going broke." SWEPCO proceeded, over the objection of Burlington Northern, to probe into specifics regarding Burlington Northern's financial condition and profitability. That evidence went far beyond any legitimate attempt to rehabilitate the expert witness. Evidence of Burlington Northern's financial condition was totally unrelated to whether the rates proposed by SWEPCO's witness in this trial would remedy a gross inequity. SWEPCO's assertion that these questions were justified in light of Burlington Northern's cross-examination are thus unfounded.

■ Finally, SWEPCO contends that the trial court erred in finding that SWEPCO had abused the discovery process and then sanctioning SWEPCO by excluding testimony of a former Burlington Northern officer. We do not reach the propriety of the discovery sanction because any error in excluding the evidence was harmless. SWEPCO claims that the excluded testimony would have shown that in the past, before this dispute arose, Burlington Northern had construed the gross inequity clauses to apply the same way that SWEPCO was asking the jury to apply them in this case. SWEPCO further contends that it "had no [Burlington Northern] documents or testimony from other [Burlington Northern] witnesses" regarding this issue. However, SWEPCO introduced other evidence from high-ranking Burlington Northern officers that addressed the same issue as the evidence excluded by the trial court:

Q I'm going to display on the screen the document that has been marked ... as Exhibit Twenty-eight. Do you recall, Mr. Crowley, this is one that the Burlington admitted was written by a man named Scanland to a man named Lawrenson, of the railroad.

A Yes.

Q Can you tell us who Mr.—do you know who Mr. Lawrenson was?

A He was one of the top executives with the railroad; might have been even the President of the company.

\* \* \*

Q All right, Mr. Crowley, I want to focus you on the first two sentences. They say, "The escalator is designed to maintain the ratio of revenue to cost. This means that the profit margin in cents per ton goes up at the same percentage rate as the costs." And then it goes on one more sentence. "When costs double, for example, the rate doubles and the cents per ton profit doubles." Do you agree with what that man in the Burlington Northern told one of the highest executives in the railroad?

A I do agree, and that coincides exactly with the example that you put on the chart.

Q Is that the way that you have applied the language of the gross inequity clause to the facts of this case?

A Yes, it is.

In light of this testimony and other similar evidence in the record, the testimony excluded by the trial court would have been cumulative. Under Texas Rule of Appellate Procedure 44.1, wrongfully admitted evidence is harmful only if it "probably caused the rendition of an improper judgment." TEX.R.APP. P. 44.1(a)(1). We cannot say that the exclusion of this evidence met that standard.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the court of appeals.