FORTUNE PRODUCTION CO., Tucker Drilling Co., Inc., Curtis Hankamer Corp., and John L. Cox, Petitioners,

v.

CONOCO, INC., Respondent.

No. 99–0490.

Supreme Court of Texas.

Argued Feb. 9, 2000.

Decided Nov. 30, 2000.

William J. Joseph, Jr., Candace Beth Kais Eindorf, Gallagher Young Lewis Hampton & Downey, Eileen F. O'Neill, Steidley Law Firm, Richard P. Hogan, Jr., Hogan Dubose & Townsend, William H. Young, Gallagher, Young, Lewis, Hampton & Downey, Houston, for petitioners.

F. Eric Fryar, Etta Davidson Fryar, Fryar, Fryar, Randall W. Wilson, Susman Godfrey, David M. Gunn, Hogan Dubose & Townsend, Houston, for respondent.

Justice OWEN delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice BAKER, Justice ABBOTT, Justice HANKINSON, Justice O'NEILL and Justice GONZALES joined, and in Parts I, II, III and V of which Justice ENOCH joined.

This is a dispute between natural gas producers and their purchaser. The producers contend, and a jury found, that (1) their contracts were induced by the purchaser's fraud regarding the resale price it would receive for residue gas, and (2) the purchaser was unjustly enriched by failing to account to the producers for field liquids. The jury also found with regard to the fraud claims that the producers had ratified their contracts by continuing to accept benefits after they had full knowledge of the fraud, with the intent to ratify the contracts in spite of the fraud. The trial court rendered judgment for the producers only on their unjust enrichment claims. All parties appealed. The court of appeals affirmed the judgment. We hold that (1) only some of the producers' claims for fraud damages are foreclosed, (2) the evidence is legally insufficient to support the total amount of fraud damages found by the jury, and (3) written contracts covering the subject matter of some of the plaintiffs' unjust enrichment claims preclude those claims. Accordingly, we reverse the judgment of the court of appeals in part and remand this case to the trial court.

## I

Four natural gas producers, Fortune Production Co., Tucker Drilling Co., Inc., Curtis Hankamer Corp., and John L. Cox, brought this suit against Conoco Inc. Conoco purchased gas from these producers for several years and processed most of the gas through plants it owned and operated to extract liquid hydrocarbons. The dispute is over the prices Conoco paid the plaintiffs from 1990 to 1995. There are two distinct aspects of this dispute. One focuses on the plaintiffs' claims that they were defrauded into accepting a lower price for residue gas, which was gas that remained after the natural gas stream had been processed. The other aspect of this dispute focuses on the plaintiffs' claims that they were entitled to additional compensation for the field liquids that collected in Conoco's pipeline system as a result of transportation and compression before the gas stream reached the processing plants. To put the various claims in perspective, it is necessary to relate some of

the history of the events leading up to this suit.

The producers' wells are connected to the Concho Valley Gas System, which consists of a gathering system and three gas processing plants. That system was originally built by Farmland. Farmland entered into long-term contracts with the plaintiffs in this case and other producers in the area to purchase their natural gas. Farmland processed the gas and resold most of the residue gas to Lone Star Gas Company under a long-term contract that obligated Lone Star to take 55,000 Mcf per day. At all times relevant to this case, Lone Star's contract also obligated it to pay $3.50 per Mcf. The prices in the contracts under which the plaintiffs initially sold their gas to Farmland included a component for residue gas based on Farmland's $3.50 resale price to Lone Star.

Farmland eventually sold the Concho Valley system and assigned its contracts with producers and Lone Star to Enerfin. Several years later, in 1989, Enerfin sold the system and assigned the contracts to Conoco. At that time, the Lone Star $3.50 contract price was well above the prevailing market price for natural gas, which, during the times at issue in this suit, ranged from about $0.90 to $2.00 per MMBtu. Conoco paid a premium of approximately $50–$60 million for the Concho Valley system in recognition of the fact that the Lone Star contract substantially increased the system's value. That was because the term of the Lone Star contract was longer than the terms of the contracts of many of the producers who were supplying the gas that was resold to Lone Star. Conoco planned to terminate the producers' contracts as the primary terms expired and negotiate new, lower-priced contracts to replace them, thereby increasing the profit margin on its resales to Lone Star. That is precisely what Conoco did after it bought the Concho Valley system.

The plaintiffs do not assert that Conoco wrongfully terminated their contracts. They concede that Conoco acted within its rights. What the producers do contend is that when Conoco negotiated new contracts, it made affirmative misrepresentations to induce them to accept a price lower than they otherwise would have. Specifically, the plaintiffs allege that Conoco told them that their residue gas would no longer be sold to Lone Star and that Conoco had enough gas from other sources to supply Lone Star's minimum take obligation. Plaintiffs contend that they were led to believe that their residue gas would and could only be resold on the spot market. However, the evidence is undisputed that most of the plaintiffs' residue gas was allocated to, and was thus effectively resold under, the Lone Star contract at all times in issue.

Some of the contracts that the jury found were induced by fraud were written, but two of the contracts were not. Three plaintiffs, Fortune, Tucker, and Hankamer, signed two-year contracts with Conoco, effective from 1990 to 1992, in which they agreed to accept a price based on spot market prices for residue gas. The contracts also provided that Conoco would pay a percentage of the net proceeds it received for certain products extracted from the gas stream during processing. Cox did not sign a new contract after the contract he originally entered into with Farmland was terminated in 1990, but he continued to deliver his gas to Conoco. He was paid a percentage of the spot market price for residue gas, and he was paid for certain plant products. Fortune and Tucker again negotiated two-year contracts with Conoco in 1992, but Hankamer declined Conoco's offers. Hankamer, like Cox, nevertheless continued to deliver gas to Cono-

co and to accept payment for residue gas based on spot market prices and to receive payments for certain plant products.

At some point in time, the plaintiffs learned that most of their residue gas had been resold by Conoco to Lone Star and that Conoco had received the $3.50 price for that gas. Precisely when plaintiffs learned these facts was disputed at trial. There was evidence that the plaintiffs did not know that their gas was resold to Lone Star until about a year before this suit was filed in 1994, but there was evidence that the plaintiffs knew the true state of affairs much earlier.

The plaintiffs sued Conoco for fraud in the inducement. They also sued to recover the value of their share of the field liquids that collected in the pipeline system before the natural gas stream reached Conoco's plant. These field liquids were removed from the system by Conoco and trucked either to tanks where they were sold or to Conoco's processing plants where they were sold at the tailgate of the plants along with other liquids that had been extracted during processing. The plaintiffs were initially paid for liquid hydrocarbons based on the proceeds Conoco received for all liquids, including field liquids. But a few years after Conoco bought the Concho Valley system, it stopped including the proceeds it received for field liquids in the calculation of amounts owed under the contracts with the plaintiffs. The plaintiffs contend that Conoco was unjustly enriched when it ceased paying them for field liquids.

Conoco asserted several defenses to the plaintiffs' two principal claims. With regard to the fraud claims, Conoco contended that the plaintiffs had ratified their agreements with full knowledge of the alleged fraud and therefore could not sue for damages. Conoco also asserted that the fraud claims were barred by limitations.

With regard to the dispute over field liquids, Conoco contended that there were express contracts that governed its purchases of the plaintiffs' gas and therefore that the plaintiffs could not sue for unjust enrichment.

At the conclusion of trial, the jury found that Conoco had committed fraud, that the fraud claims were not barred by limitations, and that the amount of fraud damages, when summed for all plaintiffs, was in excess of $5,000,000. But the jury also found that each of the plaintiffs had ratified their contracts with Conoco after they became aware of the fraud with the intent to ratify the contracts in spite of the fraud. The jury further found that Conoco had been unjustly enriched by almost $900,000 when it failed to include field liquids in its calculation of what it owed the plaintiffs. The trial court refused to disregard the jury's finding that the plaintiffs ratified their contracts with knowledge of the fraud. The trial court, therefore, did not award the plaintiffs any fraud damages. It rendered judgment for the plaintiffs only on the unjust enrichment verdict and on claims regarding other contracts that are not at issue in this Court.

The plaintiffs and Conoco appealed. The court of appeals affirmed the trial court's judgment in all respects. 35 S.W.3d 23. With regard to fraud, the court of appeals held that the jury's ratification finding was not immaterial. The court reasoned that a party who has been fraudulently induced to enter into a contract may affirm that contract and waive the right to sue for damages if it intends to do so with full knowledge of the fraud. *Id.* at 32. The court of appeals also held that the evidence was legally and factually sufficient to support the jury's finding that the plaintiffs had intentionally ratified their

contracts with full knowledge of the fraud. *Id.* at 34.

With regard to unjust enrichment, the court of appeals reasoned that Conoco had asserted an affirmative defense when it argued that the existence of a contract precluded a claim for unjust enrichment, and that Conoco was therefore required to but did not obtain a jury finding that its contracts with the plaintiffs governed field liquids. *Id.* at 28. The court of appeals also held that the contracts did not address field liquids and that the plaintiffs' claims for unjust enrichment were therefore viable. *Id.* at 29. The court further concluded that the trial court did not abuse its discretion in allowing the plaintiffs to assert their unjust enrichment claims in a trial amendment. *Id.* at 30.

All parties petitioned this Court for review, and we granted those petitions. We first consider the fraud claims.

## II

The trial court and the court of appeals held that the plaintiffs' fraud claims were defeated by the jury's finding that each of the plaintiffs continued to accept benefits under their contracts after they learned of the fraud and with the intent to ratify their contracts with Conoco in spite of the fraud.[1] The plaintiffs challenge those holdings on two bases. First, they contend that ratification of a contract induced by fraud can never constitute a waiver of the right to recover damages and that the jury's findings of ratification were there-fore immaterial. The plaintiffs contend in the alternative that there was no evidence to support the jury's ratification findings.

■ We agree with the courts below that there may be circumstances under which a party who was induced to enter a contract by fraud may ratify that contract in such a manner that a claim for damages is foreclosed. The evidence of ratification in this case is legally sufficient to foreclose Cox's and Hankamer's fraud damage claims for the periods of time after they learned of the fraud and continued to deliver gas without the benefit of a contract for a definite term. We disagree, however, that the evidence of ratification in this case was legally sufficient to foreclose Fortune's, Tucker's, or Hankamer's recovery of damages for fraudulent inducement of their written contracts.

### A

■ To support their argument that ratification of a fraudulently induced contract does not constitute a waiver of the right to recover damages, the plaintiffs rely primarily on a statement that appears in our decision in *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957). We said in that case that a defrauded party may rescind the contract or sue for damages:

> [I]t is well settled that one who is induced by fraud to enter into a contract has his choice of remedies. "He may stand to the bargain and recover dam-

---

1. The jury issue regarding ratification of the fraud was:
 Were the contracts in question "ratified" by the Plaintiffs?
 In answering this question, you are instructed that, for ratification to occur, a defrauded party must:
 1) continue to accept benefits under the contract, after they become aware of the fraud or recognize the contract is binding,

2) with full knowledge of the fraudulent acts or breach at the time of the ratification and
3) intend to ratify the contract in spite of the fraud.
 Answer "Yes" or "No": [inquiry as to each producer omitted]

ages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid."

*Id.* at 238–39 (citations omitted).

The foregoing reference to the remedies for fraud is a correct statement of a long-standing, general proposition of law. *See, e.g., Andrews v. Powell,* 242 S.W.2d 656, 660–61 (Tex.Civ.App.—Texarkana 1951, no writ) (setting forth the same general proposition and citing authorities). However, it was not intended as an all-encompassing analysis of fraud or the intricacies of the remedies for fraud. The issue under consideration in *Dallas Farm Machinery* was whether language in a contract that disclaimed all warranties other than the contract's express warranty precluded the admission of parole evidence of false representations by the seller about the work capabilities of the tractor and loader that it sold to the plaintiff. The statement quoted above was made in the course of observing that two conflicting lines of authority could not be distinguished on the basis that they dealt with different remedies for fraud. *Dallas Farm Machinery,* 307 S.W.2d at 238–39. That general observation cannot be stretched to stand for the proposition that ratification of a contract induced by fraud can never result in the loss of the right to recover damages.

This Court recognized almost ninety years ago that a party may affirm a contract that has been induced by fraud in such a way that damages are foreclosed. In *Kennedy v. Bender,* 104 Tex. 149, 135 S.W. 524 (Tex.1911), this Court held that the actions taken by a defrauded shareholder in affirming his purchase of stock did not raise a fact issue of whether his right to recover damages had been waived, but the Court recognized that waiver could occur under some circumstances:

[N]othing that Bender did in the exercise of his rights as a stockholder in the corporation can be looked to as in any way affecting his claim for damages against appellants, unless it be shown by the evidence that his purpose in so acting was to waive his right against them, or that in some way he acquired something of value from the appellants, with the purpose and intent of waiving his right of action for damages.... "The question of waiver, however, is largely one of intent. Hence acts done in affirmance of the contract can amount to a waiver of the fraud only where they are done with full knowledge of the fraud and of all material facts, and with the intention, clearly manifested, of abiding by the contract and waiving all right to recover for the deception. Acts which, although in affirmance of the contract, do not indicate any intention to waive the fraud, cannot be held to operate as a waiver."

*Id.* at 525 (citations omitted).

Ratification of an agreement was held to effectively foreclose two plaintiffs from obtaining redress for fraud in the inducement in *Spellman v. American Universal Investment Co.,* 687 S.W.2d 27 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). In that case, the plaintiffs owned a $^{16}\!/_{28}$ interest in minerals. A jury found that they had been induced by fraud to convey a $^{14}\!/_{28}$ interest (a one-half interest) under a lease when they intended to convey only one-half of what they owned, which would have been 8/28. However, the jury also found that the plaintiffs had ratified the lease when they accepted delay rentals and royalties after they knew of the fraud. The court of appeals held that ratification of the lease foreclosed the plaintiffs from rescinding or reforming the lease. *Id.* at 31–32. They were thus left with their bargain and had no means of recovery.

In the course of the opinion in *Spellman,* the court of appeals quoted language from its earlier decision in *Wise v. Pena,* 552 S.W.2d 196 (Tex.Civ.App.—Corpus Christi 1977, writ dism'd), which had indicated that the right to sue for damages could be waived by ratification of a fraudulently induced contract:

> "Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate. [Citation omitted.] Ratification occurs when one, induced by fraud to enter into a contract, continues to accept benefits under the contract after he becomes aware of the fraud or if he conducts himself in such a manner as to recognize the contract as binding.... Once a contract has been ratified by the defrauded party ..., the defrauded party waives any right of rescission or damages."

*Spellman,* 687 S.W.2d at 29–30 (quoting *Wise,* 552 S.W.2d at 199–200). Dicta similar to the foregoing passage from *Wise* appears in *1st Coppell Bank v. Smith,* 742 S.W.2d 454, 461 (Tex.App.—Dallas 1987, no writ), which says that "[h]aving ratified, that party waives any right of rescission or damages."

■ The truncated quotation of *Wise* in *Spellman* and the dicta in *1st Coppell* are overstatements of the law. Not every ratification of a contract induced by fraud will waive the right to sue for damages, as distinguished from the right to rescind. *See Andrews,* 242 S.W.2d at 661 (observing that "[a]cts done in affirmance of the original contract do not necessarily constitute waiver of the right of action for damages.") This Court implicitly indicated in *Rosenbaum v. Texas Bldg. & Mortg. Co.,* 140 Tex. 325, 167 S.W.2d 506 (1943), that accepting an interest payment on bonds did not result in the loss of the right to sue for

damages for fraudulent inducement of their purchase. Although the Court held that accepting the payment "unquestionably was a positive act of ratification of the contract" that waived the right of rescission, this Court remanded the case to be "tried as an action for damages." *Id.* at 507–08.

The difficulty in stating a general rule about what acts of ratification will or will not waive fraud has been recognized by at least one Texas court. *Indem. Ins. Co. of N. Am. v. Sterling,* 51 S.W.2d 788, 791 (Tex.Civ.App.—Beaumont 1932, writ dism'd) ("The difficulty of stating a general rule as to what will constitute 'waiver or estoppel' or 'ratification,' to assert fraud in actions of the character now under discussion, is generally recognized."). The decision in *Sterling* concerned rescission of a workers' compensation settlement agreement. The court held that the plaintiff's expenditure of settlement money after he knew of the fraud did not waive the fraud. *Id.* at 791.

Some courts have indicated that if a defrauded party entered into a new agreement after learning of the fraud, the right to sue for damages would be foreclosed. *Wise,* 552 S.W.2d at 199–200 (observing that ratification and the loss of the right to sue for damages would occur if the defrauded party enters into a new agreement after he becomes aware of the fraud); *see also Andrews,* 242 S.W.2d at 661 (holding that when the defrauded plaintiff did not accept an amendment offered by the party who defrauded him, his right to sue for damages remained intact). The court in *Wise* also indicated that if a contract induced by fraud is wholly executory, the defrauded party cannot ratify the contract and then sue for fraud. "This would amount to condoning the fraud." *Wise,* 552 S.W.2d at 202. There are courts in other jurisdictions in accord with that

view. *See generally* 12 WILLISTON, A TREA-TISE ON THE LAW OF CONTRACTS § 1524 at 612 (W. Jaeger ed., 3d ed.1970). But at least one commentator disagrees. *See id.* § 1524 at 613 ("[I]t would seem that one who has been defrauded could, although the contract is executory, affirm the contract and perform it without forfeiting his right to maintain an action to recover damages resulting from the deceit.").

The Restatement (Second) of Torts takes the position that if a party who knows of the fraud makes a promise to perform all or part of the agreement after learning of the fraud, that promise is binding. *See* RESTATEMENT (SECOND) OF TORTS § 85. An illustration given in the Restatement is: "A is induced by B's fraud to promise $100 in return for a worthless chattel. After discovering the fraud A promises B to pay as agreed. The promise is binding." *Id.* cmt. b, illus. 1. And, *Andrews* suggests that if the defrauded party has "acted as to mislead the other," then the right to sue for damages might be waived. 242 S.W.2d at 661.

■ In this case, as a matter of law, the limited acts of three of the plaintiffs in ratifying contracts with a stated term did not foreclose their right to sue for fraud damages. It is undisputed that Fortune and Tucker continued to deliver their gas to Conoco and to accept payment after they learned of the fraud. But these facts, standing alone, do not result in a loss of the right to sue for damages. Fortune and Tucker had the right to sue for fraud damages to obtain the benefit of their bargain with Conoco. *See Rosenbaum,* 167 S.W.2d at 507–08. The same is true with regard to Hankamer's written contract with Conoco, which was executed in 1990 and terminated in 1992.

■ However, the circumstances are different for Hankamer for periods of time after its written contract terminated and for Cox. Hankamer had no written agreement with Conoco after its 1990 contract expired in 1992. Cox had no written contract with Conoco after his original contract was terminated in 1990. Both producers refused to sign a contract with Conoco and simply delivered their gas and accepted payment. There was no agreement that Cox or Hankamer was required to sell or that Conoco was required to purchase gas for any definite term.

■ The jury found that a 1990 Cox contract and a 1992 Hankamer contract were induced by fraud. Conoco contends that these agreements could not have been induced by fraud since Cox and Hankamer refused to enter into written contracts. Conoco contends in the alternative that Cox and Hankamer ratified any fraud when they continued to deliver gas after they learned their gas had been resold to Lone Star at $3.50 per Mcf. Conoco's position is sound, up to a point. The jury found, and there is legally sufficient evidence, that when Cox and Hankamer first began tendering their gas without written contracts, they did so as a result of Conoco's misrepresentations. However, the arrangements that Cox and Hankamer had with Conoco after they no longer had written contracts were terminable by any party at any time. Thus, while Cox and Hankamer may initially have been induced by Conoco's misrepresentations to deliver their gas and accept spot market prices, the misrepresentations could not have induced them to tender their gas once they knew the truth. When they delivered their gas after they knew of Conoco's fraud, with no obligation to continue deliveries, they were no longer relying on misrepresentations. And, if Cox or Hankamer had told Conoco that they intended to sue for damages for the gas they delivered after they knew of the fraud, Conoco could have ceased purchasing their gas with im-

punity. By delivering gas when they had no continuing obligation to do so after they learned that Conoco had made misrepresentations, Cox and Hankamer entered into a new series of agreements with full knowledge of all material facts and of the prices that they were accepting. As one commentator has explained, "accepting goods with knowledge that they are offered at a certain price indicates a promise to pay that price." 2 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, § 6:42 at 446 (R. Lord ed., 4th ed.1991). By the same token, delivering goods with full knowledge of the price offered forms an agreement to accept that price. Cox and Hankamer cannot sue for damages for fraud as to deliveries they made after they knew their gas was being resold to Lone Star at the $3.50 price. Cox and Hankamer were in the same position as someone who decides to perform wholly executory contracts after learning of fraud. The fraud no longer induced their performance. It can also be said that Cox and Hankamer ratified their agreements when they continued to perform with knowledge of the fraud, and their claims for damages are foreclosed with regard to all deliveries made after the fraud came to light.

### B

We note that Conoco did not object to the form of the ratification issue that was submitted to the jury. It argues for the first time on appeal that the issue is one of "waiver" rather than "ratification." Courts and commentators have variously used the terms "waiver," "ratification," and "affirmance" in discussing the legal effect of a party's actions after it learns that its contract was induced by fraud. We express no opinion on whether a jury issue should be framed in terms of ratification, affirmance, or waiver.

### C

In sum, we hold that based on the evidence in the record before us, Fortune and Tucker are not precluded from recovering fraud damages simply because they continued to perform contracts that were binding for a stated term after they learned of the fraud that induced those contracts. Conoco's ratification defense only forecloses Cox and Hankamer from recovering damages for the periods of time when they knew of Conoco's fraud and thereafter delivered their gas without a contract for a stated term. When Cox and Hankamer learned of the fraud was not resolved by the jury.

Conoco asserts that even if its ratification defense fails, the court of appeals' judgment in its favor on the plaintiffs' fraud claims should be affirmed, at least in part, on other grounds. We turn to those contentions.

### III

■ Conoco does not dispute in this Court that there was evidence that misrepresentations were made to Tucker, Hankamer, and Cox in 1990 and 1992, and to Fortune in 1992. Conoco contends, however, that there is no evidence that it made any material misrepresentation to Fortune in 1990. We disagree.

Jack Green, the person who negotiated with Conoco on behalf of Fortune, testified that during the 1992 contract negotiations, Conoco's representative, Kerr, told him that Fortune's gas was not dedicated to the Lone Star contract and was not being sold to Lone Star. Green testified that he had no reason to disbelieve Kerr because "that was what Conoco had said before." This is legally sufficient evidence to support the jury's finding that Conoco made a misrepresentation that induced Fortune to agree to the pricing terms in the 1990 contract.

■ Conoco also argues that a merger clause that was contained in its written contracts with Fortune, Tucker, and Hankamer forecloses reliance on any misrepresentations that may have been made to these producers. Conoco did not assert this argument in the trial court, and, therefore, it has not been preserved for appeal. Tex.R.App. P. 33.1(a); *City of Port Isabel v. Shiba*, 976 S.W.2d 856, 860–61 (Tex.App.—Corpus Christi 1998, pet. denied).

## IV

■ Conoco contends that the evidence supporting the jury's award of damages for fraud is legally insufficient. We agree. While there is evidence that the plaintiffs may have been able to obtain a slightly higher price from Conoco for their residue gas had they known that most of their gas was to be resold to Lone Star, there is no evidence to support the full amount of the jury's award.

■ There are two measures of damages for fraud. They are the benefit-of-the-bargain measure and the out-of-pocket measure. *E.g., Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex.1998). Benefit-of-the-bargain damages are the difference between the value as represented and the value received. *Id.* Out-of-pocket damages compensate a defrauded party for the difference between the value of that with which he or she has parted and the value actually received. *Id.* The fraud damage issue submitted to the jury was based on a benefit-of-the-bargain measure. Conoco does not contend that an out-of-pocket measure should have been submitted. It contends only that there is no evidence of fraud damages.

There is evidence that when Conoco negotiated with the plaintiffs in 1990 and 1992, Conoco was uncertain as to whether its gas supply would be sufficient to tender 55,000 Mcf per day to Lone Star at all times. There is also evidence that after Conoco concluded negotiations with the plaintiffs in 1992, it agreed to pay another producer, International Paper, slightly more than the spot market price for residue gas. In 1992, Conoco entered into a contract with IP in which it agreed to pay for 82.5% of the residue gas attributable to IP's wells. The volume Conoco agreed to purchase from IP was at least 30 Mcf per day, which was larger than the plaintiffs' collective 6 Mcf per day. The price Conoco agreed to pay for that residue gas was a blended price. For ten percent of 82 .5% of IP's residue gas, Conoco agreed to pay the same price that it received from Lone Star, which was $3.50. For the remaining ninety percent of 82.5% of IP's residue gas, Conoco agreed to pay the monthly weighted average spot market price, the same price that the plaintiffs received from Conoco. With the exception of IP, there is no evidence that Conoco paid any producer a price other than one based entirely on the weighted average spot market price, and there was evidence that Conoco declined to buy other producers' gas rather than pay above spot market for it.

Viewing the evidence in the light most favorable to the jury's verdict, there is some evidence that but for Conoco's misrepresentation that it would not and could not resell the plaintiffs' gas to Lone Star, the plaintiffs could have negotiated the same pricing terms for their respective percentages of residue gas that IP received.[2] The bargain that the plaintiffs

---

2. The plaintiffs in this case agreed to be paid based on differing percentages of the residue gas attributable to their respective interests.

Hankamer accepted 75%, Fortune negotiated 80%, Cox received 70%, and Tucker agreed to

struck with Conoco was based on assurances from Conoco that it could only resell the plaintiffs' gas on the spot market and that it would not receive the higher Lone Star price for the plaintiffs' gas. In reliance on these representations, the plaintiffs agreed to accept spot market prices rather than a price tied in some manner to the Lone Star contract price. Because Conoco agreed to pay at least one producer the Lone Star price for a small fraction of its residue gas, there is some evidence of benefit-of-the-bargain damages. The bargain that the plaintiffs say they could have struck with Conoco is not "hypothetical," as the dissent argues, 52 S.W.3d at 687, because of the evidence of the bargain that Conoco did in fact strike with IP.

■■■ Our holding in this case is consistent with what we said in *Formosa Plastics* about benefit-of-the-bargain damages:

> Burnette calculated his hypothetical $1.3 million bid by multiplying his $600,000 bid, including his anticipated profit, by a factor of about 2.2. However, this doubling of Presidio's bid is entirely speculative *because there is no evidence that Presidio would have been awarded the project if it had made a $1.3 million bid.* In fact, if any inference could be drawn, it would lead to the opposite conclusion because two of the three other bids Formosa received were lower than $1.3 million. Burnette's testimony as to what he would have bid had he known the truth simply does not establish the benefit of any bargain made with Formosa. It is not based on the expenses incurred and profits lost on this contract because of Formosa's representations, but rather is based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated. This testimony is therefore not legally sufficient

accept 75% for some wells and 70% for oth-

evidence supporting an award of $700,000 in damages.

960 S.W.2d at 50 (emphasis added). We acknowledged in *Formosa Plastics* that if there is evidence of the bargain that would have been struck had the defrauded party known the truth, there can be a recovery for benefit-of-the-bargain damages.

The evidence in this case does not, however, support the amount of the damages found by the jury. The jury found that if the plaintiffs had known the true state of affairs, they could have negotiated a price based entirely on the Lone Star $3.50 per Mcf price for their respective percentages of residue gas. But there was no evidence that Conoco would have agreed to pay anything approaching $3.50 per Mcf for all of the plaintiffs' residue gas. The evidence showed that, at best, the plaintiffs could have negotiated a price based on the $3.50 Lone Star price for only ten percent of their respective shares of residue gas. Under these circumstances, the plaintiffs' fraud claims must be remanded to the trial court for another trial. *Formosa Plastics,* 960 S.W.2d at 51; *see also Texarkana Mem'l Hosp. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1997).

Thus far, we have considered only the parties' respective contentions regarding fraud and the residue gas component of the price they agreed to accept for their gas. The remaining issue is whether Conoco was obligated to pay unjust enrichment damages to the plaintiffs for field liquids. We turn to that aspect of the controversy.

## V

Field liquids, sometimes called field condensate, can collect in a gathering system when the gas is transported. And, when

ers.

compression is necessary to move gas through a pipeline, heavier liquids can condense and separate from the natural gas stream. Conoco's gathering system employed compressors to facilitate transportation of the gas it purchased. Field condensate developed after Conoco took delivery of and title to the plaintiffs' gas but before the gas stream reached Conoco's processing plants. Conoco collected the field liquids and trucked them to either the tailgates of its plants or to tanks where the field liquids were sold.

When Conoco first purchased the Concho Valley system, it, like its predecessors, allocated the field liquids as part of the other liquids recovered through plant processing in calculating what was owed to the plaintiffs under their respective contracts. However, Conoco subsequently ceased that practice and began allocating and accounting for the field liquids separately. Field liquids were no longer used to calculate how much the plaintiffs were to be paid for the "Plant Products" component of the price specified under the written contracts that Conoco had with some of the plaintiffs.

Plaintiffs initially sued to recover the value of these field liquids under a theory of conversion. At the conclusion of the evidence at trial, the trial court granted Conoco's motion for directed verdict on the conversion claim, apparently in recognition of the fact that Conoco took title to the entire gas stream before the field liquids developed. The plaintiffs have not pursued their conversion claim on appeal. After the trial court directed a verdict on the conversion claim, it permitted the plaintiffs to amend their petition to assert that Conoco had been unjustly enriched by its treatment of field liquids.

Conoco asserted as an affirmative defense that a claim for unjust enrichment is unavailable when an express contract governs the subject matter of the dispute. The court of appeals held that Conoco waived this defense by failing to secure a finding from the jury that its express contracts with the plaintiffs governed the treatment of field liquids. 35 S.W.3d at 28. We agree with that determination to the extent that it dealt with Cox's claims and with Hankamer's claims after its 1990 contract expired in 1992. The court of appeals was in error, however, when it held that Conoco waived its affirmative defense by not requesting a jury issue with regard to the written contracts Conoco had with Fortune, Tucker, and Hankamer. The court was also incorrect in concluding that those written contracts did not control payment for field liquids. 35 S.W.3d at 29.

The plaintiffs in this case elected to pursue a claim for unjust enrichment rather than breach of contract. Conoco contends that because express contracts governed the sale of the entire gas stream, the plaintiffs were foreclosed from asserting a cause of action for unjust enrichment. It was undisputed that Conoco had written contracts with Fortune and Tucker at all material times, and that it had a written contract with Hankamer from 1990 to 1992. Those contracts were in evidence, and they are unambiguous. None of the material facts regarding the parties' performance under the contracts are in dispute. Under these circumstances, there was no issue for the jury to decide. The effect of the written contracts on claims for unjust enrichment is one of law.

Unjust enrichment claims are based on quasi-contract. Calamari et al., THE LAW OF CONTRACTS, § 1–12 (3d ed.1987); 1 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, § 1:6 (R. Lord ed., 4th ed.1990). "The principal function of quasi contract is generally said to be that of prevention of unjust enrichment." Calamari, *supra,*

§ 1–12; *see also* WILLISTON, *supra*, § 1:6 ("Quasi contractual obligations are imposed by the courts for the purpose of bringing about a just result without reference to the intention of the parties.") A quasi-contract "is not a peculiar brand of contract." Calamari, *supra*, § 1–12. It "is not a contract at all but an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended." *Id.*

 Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, *see generally TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex.App.—San Antonio 1996, writ denied), with certain exceptions not relevant here, *see, e.g., Southwestern Electric Power Co. v. Burlington Northern Railroad Co.*, 966 S.W.2d 467, 469–70 (Tex.1998) (observing that overpayments under a contract can be recovered under a theory of restitution or unjust enrichment). That is because parties should be bound by their express agreements. When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement. *See TransAm. Natural Gas Corp.*, 933 S.W.2d at 600. Accordingly, when a party claims that it is owed more than the payments called for under a contract, there can be no recovery for unjust enrichment "'if the same subject is covered by [the] express contract.'" *See id.* (quoting *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 154 (Tex.App.—Texarkana 1988, writ denied)).

The written contracts that Conoco had with Fortune, Tucker, and Hankamer dealt with the sale of the entire stream of gas produced by those plaintiffs' wells. The term "gas" was defined by the contracts as "all elements and compounds and mixtures thereof comprising the effluent vapor stream as produced from each lease or well." The contracts further provided that Conoco took title to "the gas and all components" at specified delivery points. Those delivery points were upstream from the point at which field condensate formed, which meant that the field liquids separated out of the gas stream after Conoco had taken delivery of the gas. The contracts specify what Conoco was obligated to pay for "gas delivered," which was in turn contractually defined as the entire gas stream that was delivered at the delivery points. The fact that the pricing formula does not specifically reference field liquids does not mean that the contracts did not cover those liquids. Conoco may or may not have breached one or more provisions of the contract by failing to properly account for or allocate the field liquids. The plaintiffs never sought a determination of that issue. But either way, the contract governs the parties' respective rights and obligations with regard to the entire stream of gas. The subject matter of the written contracts is the entire gas stream. The subject matter of the unjust enrichment claims is field liquids, a part of that gas stream.

The contract price was what the parties agreed in the written contracts was to be paid for the entire stream of gas at specified delivery points. The parties could have agreed to pay a fixed price at the wellhead. The plaintiffs could not then recover under a theory of unjust enrichment if Conoco processed the gas and extracted valuable liquids or if Conoco compressed the gas during transportation which resulted in field liquids. Similarly, the parties could have agreed to a pricing mechanism that compensated the plaintiffs for all their gas based on the value of only certain types of liquid hydrocarbons that were extracted. The plaintiffs could not then recover under a theory of unjust en-

richment if Conoco extracted and sold other types of liquids.

 The written contracts in this case foreclose any claims for unjust enrichment. A cause of action for unjust enrichment is not available to recover payments in addition to the contract price the parties agreed upon for the entire gas stream. But written contracts were not in place with all plaintiffs at all times. The evidence does not reflect the specific terms of the arrangement Conoco had with Cox from and after 1990 or with Hankamer after its 1990 contract expired in 1992. Cox and Hankamer delivered their gas to Conoco, and Conoco paid them without a written agreement. We do not know whether the parties' agreements covered the entire stream of gas or only distinct components of the gas stream. Conoco did not request a jury finding or move for a directed verdict to establish the terms under which it paid Cox after 1990 or the terms under which it paid Hankamer after 1992. When the existence of or the terms of a contract are in doubt, and there is a claim for unjust enrichment, it is incumbent on the party disputing that claim to secure findings from the trial court that an express contract exists that covers the subject matter of the dispute. *See generally Freeman v. Carroll*, 499 S.W.2d 668 (Tex.Civ.App.—Tyler 1973, writ ref'd n.r.e.) (holding that it was incumbent upon a defendant to request an issue to determine whether a contract existed that precluded recovery on a quantum meruit theory). Conoco therefore failed to establish its affirmative defense with regard to any part of Cox's claim for unjust enrichment and Hankamer's claim for unjust enrichment after its 1990 contract expired.

Conoco contends that the trial court erred in permitting the plaintiffs to assert unjust enrichment in a trial amendment after all the evidence had been adduced.

For the reasons set forth by the court of appeals, 35 S.W.3d at 30, we agree with that court that the trial court did not abuse its discretion in allowing the trial amendment.

The judgment of the court of appeals is affirmed to the extent that it awards damages to Cox based on unjust enrichment. To the extent the judgment awards unjust enrichment damages to Fortune and Tucker, it is reversed, and judgment for Conoco is rendered on those claims. The jury's verdict awarding unjust enrichment damages to Hankamer did not differentiate between the time it had a written contract with Conoco in place and the time it did not. Accordingly, we reverse the judgment of the court of appeals to the extent that it awarded unjust enrichment damages to Hankamer and remand that claim to the trial court for further proceedings.

\* \* \* \* \*

In conclusion, we hold: 1) as a matter of law, Fortune's, Tucker's, and Hankamer's conduct in ratifying their contracts for a stated term with Conoco after they learned of the fraud did not foreclose their right to recover fraud damages; 2) to the extent that Hankamer and Cox delivered gas without a contract for a stated term after they knew of Conoco's fraud, they are foreclosed from recovering fraud damages; 3) Fortune's and Tucker's claims for unjust enrichment fail because their express contracts governed the subject matter of those claims; 4) for the same reason, Hankamer's claim for unjust enrichment for gas delivered under its 1990 contract fails; 5) the court of appeals' judgment should be reversed to the extent that it awards Hankamer unjust enrichment damages, and Hankamer's unjust enrichment claim should be remanded to the trial court; and 6) the court of appeals did not

err in affirming the judgment in favor of Cox for unjust enrichment damages.

Accordingly, we reverse the judgment of the court of appeals in part and remand the plaintiffs' fraud claims and Hankamer's unjust enrichment claim to the trial court for further proceedings consistent with this opinion.

Justice ENOCH, concurring and dissenting.

Although I join Parts I, II, III and V of the Court's opinion, I can't join its conclusion that there is some evidence of fraud damages warranting a remand to the trial court, because the Court measures those damages against a bargain that was not, in fact, made. Consequently, I must dissent in part.

The Court goes astray when it looks for evidence that the plaintiff natural gas producers could have forced Conoco, Inc. to pay more had Conoco not misled them about its intent to continue selling their residue gas to Lone Star. To award damages on this basis compensates the producers not for any damages actually sustained, but for lost profits on a bargain they never made. The law doesn't allow such a recovery. Further, the producers eschew reliance on any evidence that might establish appropriate damages. I would affirm the court of appeals' judgment for Conoco on the fraud claim.

In a fraudulent inducement case, as the Court agrees, there are two measures of damages-out-of-pocket and benefit-of-the-bargain.[1] Out-of-pocket damages represent the difference between the value of the thing parted with and the value received in return.[2] This measure of damage compensates a party for actual damages, not lost profits.[3] Benefit-of-the-bargain damages, on the other hand, represent the difference between the value as represented and the value received.[4] Significantly, benefit-of-the-bargain damages could include anticipated profits.[5] And until today, to get those lost profits, one would have had to prove that there was indeed a bargain made.

Conoco correctly argues that the producers have no benefit-of-the-bargain damages because the benefit the producers have sued for is not the benefit of any bargain made. That is, the parties never agreed that the producers would get a percentage of the Lone Star price. The producers insist, however, that they are entitled to benefit-of-the-bargain damages because they were *bargaining* for a percentage of the actual proceeds Conoco received from selling their gas to Lone Star, but were misled into *agreeing* to accept only a percentage of the lower spot-market price. As a result, the jury had sufficient evidence to award damages based on a percentage of the Lone Star price. Interestingly, the Court apparently agrees with Conoco that there was no bargain for the higher price because the Court reverses the jury award.[6] And in fact, the contracts between the parties demonstrate that the bargain reached was for the producers to receive a percentage of the spot market price:

---

**1.** *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex.1998).

**2.** *Id.*

**3.** *Morriss–Buick Co. v. Pondrom,* 131 Tex. 98, 113 S.W.2d 889, 890 (1938).

**4.** *Formosa Plastics,* 960 S.W.2d at 49.

**5.** *Id.* at 50.

**6.** 35 S.W.3d at 30.

The amount of payment for Residue Gas shall be eighty percent (80%) of the monthly Weighted Average Sales Price (W.A.S.P.) per MMBTU received by Buyer, f.o.b. Buyer's Plant(s), for all Residue Gas sales sold on a "short-term" spot market basis and allocated to gas delivered hereunder. "Short term" sales shall include all Residue Gas contracts with terms of one year or less.

What the producers really argue is that they would have made a different bargain, but for misrepresentations by Conoco. According to the producers, the misrepresentation was two-fold: that Conoco would pay a percentage of the price it received *and* that the only price it could get was the spot market price. As a result, the producers agreed to accept a percentage of spot market price. But as I've stated, to claim benefit-of-the-bargain damages, the producers must show they got less than what they bargained for. And here, they bargained for spot market price, which is what they got.

The Court first errs by agreeing with the producers that benefit-of-the-bargain damages are applicable. The facts of this case demonstrate that the out-of-pocket measure is the appropriate measure. That is, the producers' damages, if any, result from them being misled into selling their gas to Conoco at a price lower than what they could have received by selling their gas elsewhere.

Second, the Court compounds its error when it says that the producers' benefit-of-the-bargain damages can be shown by evidence that they could have gotten a higher price *from Conoco* for their gas. This

conflates the benefit-of-the-bargain and out-of-pocket measures of damages.

Finally, the Court caps its error by accepting as evidence of damages a bargain Conoco struck with someone else—a bargain that not even the producers argue for. This is error because those damages compensate the producers for profits from "a hypothetical bargain never struck"—an approach we rejected in *Formosa Plastics.*[7]

In *Formosa Plastics,* a contractor bid on a construction job on the basis of misrepresentations made by the project owner. The misrepresentations resulted in the job costing more than the contractor had anticipated, so that instead of making a profit the contractor suffered a loss. The contractor had bid $600,000 on the job, contemplating costs of $370,000 and a profit of $230,000. Instead, the costs totaled $831,000. The trial court rendered judgment for $700,000 in damages based on the contractor's testimony that, had he known the truth, he would have bid $1.3 million for the job. This Court, however, rejected a computation of damages based on what the contractor otherwise would have charged, noting that such evidence established neither the benefit-of-the-bargain actually made, nor the out-of-pocket loss the contractor actually sustained from the higher than expected costs. Rather, the Court observed, such evidence was "based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated."[8] It is a leap of faith for the Court to say today that the *Formosa Plastics* statement that "this doubling of Presidio's bid is entirely speculative because there is no evidence that Presidio would have been awarded the project if it had made a $1.3 million bid"[9]

**7.** *See id.* at 49–50.

**8.** *Id.* at 50.

**9.** *Id.*

means that "if there is evidence of the bargain that would have been struck had the defrauded party known the truth, there can be a recovery for benefit-of-the-bargain damages." [10]

*Formosa Plastics*, as a matter of law, forecloses a damage award based on what the producers would have charged if they had known Conoco could get the Lone Star price for their gas. Rather, if the producers are entitled to damages, it is for out-of-pocket damages, which are based on the difference between the value of the thing parted with and the value received. In short, the producers were damaged if the gas they sold to Conoco was worth more than what Conoco paid them for it. And in this context, the appropriate measure of the gas's worth is its fair market value, which would be the price the gas would have sold for "when it is offered for sale by one who desires, but is not obliged, to sell, and is bought by one who is under no necessity of buying it" [11]—not the price that the producers might hypothetically have secured had they known their gas was going to Lone Star.

Stated another way, the producers suffered no damages if Conoco paid them fair market value for their gas. [12] Thus, it was up to the producers to show that they could have gotten a better price from another purchaser but for Conoco's misrepresentations. But the producers point to no evidence that they could have sold their gas for anything more than Conoco paid them. Indeed, they expressly disclaim reliance on any such evidence. Consequently, there is no evidence that the producers suffered any damages from Conoco's misrepresentations.

The Court apparently buys the producers' premise that they are "in a unique market with an asset that was particularly valuable to Conoco." [13] Boiled down, their complaint is that because Conoco misled them about its down-stream sales plan, they were unable to hold Conoco up for a higher price than their gas was worth on the open market. Fraud damages aren't intended to compensate for a bargain not made.

Because there is no evidence that the producers could have sold their gas for a higher price than they were induced to sell it to Conoco, they suffered no compensable damage as a matter of law. I dissent from the Court's conclusion otherwise.

10. 52 S.W.3d at 682.

11. *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194, 202 (1936); *see also* RESTATEMENT (SECOND) OF TORTS § 549(1)(a), cmt. c ("The value of the article is normally determined by the price at which it could be resold in an open market....").

12. *See, e.g., Whitfield v. Klein Indep. Sch. Dist.*, 463 S.W.2d 232, 235 (Tex.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.) (no damages when party induced by alleged misrepresentations to sell property for fair market value).

13. *Fortune Production Co., et al.'s Response to Conoco's Post–Argument Submission*, p. 4.