PLACEMAKER, INC., et al., Appellants,

v.

Cecil GREER, et al., Appellees.

No. 12–82–0113–CV.

Court of Appeals of Texas, Tyler.

June 30, 1983.

Rehearing Denied Aug. 4, 1983.

Frank M. Mason, Kenley, Boyland, Coghlan & Griffin, Longview, for appellants.

Lew Dunn, Adams & Shepherd, P.C., Longview, for appellees.

SUMMERS, Chief Justice.

This is an appeal from an order of the trial court granting a temporary injunction. Appellees, Cecil Greer and Linda Greer, brought suit seeking temporary and permanent injunctive relief against appellants, Placemaker, Inc. (hereafter Placemaker), Robert Allen and James Buie, to prohibit them from filing with the Planning and Zoning Commission of the city of Longview, Texas, any proposal to replat Lot No. 1 [of Block 1019] and the small strip of land designated as a street easement at the western end of Cornell Street as shown in the plat of Huntington Park South Subdivision, Unit 1. The trial court granted appellees a temporary restraining order, and after a hearing, a temporary injunction on June 18, 1982, as prayed for in their petition. Appellants have appealed. We reverse and dissolve the temporary injunction.

The record reflects that Huntington Park South Subdivision to the city of Longview was created by a plat filed for record in the Deed Records of Gregg County, Texas, on May 22, 1978. A dedication and certain restrictions governing use and development of property located in said subdivision, set forth in an instrument dated June 15, 1978, was filed for record in the Deed Records of Gregg County on June 22, 1978. Subsequently, on August 4, 1978, Placemaker, the owner of Huntington Park South Subdivision, deeded to Cecil Greer and wife Linda Greer a residential lot in the subdivision described as Lot 5, Block 1018, according to the plat of record in Volume 1124, Page 313, Deed Records, Gregg County, Texas.

Placemaker retained the services of Mike Day Realty to assist in marketing the lots; under their oral agreement Day was to receive a four per cent (4%) commission on the lots which he sold. Placemaker was also selling some of the lots through its own office. Placemaker owned no interest in Mike Day Realty, and Mike Day Realty had no ownership in Placemaker. Malinda Lenhart, a licensed realtor with Mr. Day's firm, in May and June of 1978, showed the property in Huntington Park South Subdivision to Cecil and Linda Greer. Mrs. Lenhart gave the Greers a copy of a portion of the plat of Huntington Park South Subdivision. This copy contained certain handwritten notations including the term "common area" written into the area designated as Lot 1 of Block 1019 of the subdivision. These handwritten notations were placed on the map by Mike Day and were not contained on the original recorded plat of the subdivision referred to in the Greers' deed. Mike Day

and Malinda Lenhart represented to the Greers that Lot 1 of Block 1019, referred to as a "common area" on the map they gave the Greers, would remain undeveloped. The lot purchased by the Greers is located immediately north of and borders on a portion of said Lot 1 in Block 1019.

The recorded plat of Huntington Park Subdivision contains a call for a street easement at the far west end of Cornell Street. This street easement was required by the city of Longview in approving the subdivision plat so that a street outlet would be provided from the cul-de-sac on the western end of Cornell Street. Subsequent to the filing of this plat the city in a change of position indicated that a street outlet from the west end of this cul-de-sac would no longer be required. Placemaker then in January 1981 filed a request with the Planning and Zoning Commission of the city of Longview to replat a portion of the subdivision, by combining that portion of Lot 1, Block 1019 immediately to the south of the Greers' lot with that strip of land previously designated as a street easement for an outlet from the cul-de-sac at the west end of Cornell Street. This request was granted by the Planning and Zoning Commission but was not approved by the City Council. Immediately prior to the institution of this action, Placemaker refiled its request for replatting such property with the Planning and Zoning Commission of the city of Longview.

Appellants bring three points of error alleging that the trial court abused its discretion in granting the temporary injunction because:

1. the uncontroverted evidence demonstrates, as a matter of law, that the plaintiffs have no cause of action against these defendants;

2. the uncontroverted evidence establishes, as a matter of law, that plaintiffs will suffer no immediate or irreparable injury from the complained acts;

3. a balancing of the equities and convenience between the parties establishes, as a matter of law, that the grant-

ing of the temporary injunction will result in oppressive, harsh, unconscionable and inequitable injury to defendants, whereas the denial of such temporary injunction will result in little or no harm to plaintiffs.

■ The purpose of a temporary injunction is to prevent a threatened wrong and to preserve the status quo until the rights of the parties can be determined upon a final hearing. As a general proposition the grant or denial of a temporary injunction rests within the sound discretion of the trial court. *Texas Foundries, Inc. v. International Molders and Foundry Workers' Union,* 151 Tex. 239, 248 S.W.2d 460, 463 (1952). However, the judicial discretion to grant a temporary injunction does not extend to a case which presents a question of law only and in which the facts are established and contrary to petitioners' right to prevail. 31 Tex.Jur.2d Injunctions § 36; *Tyree v. Road District No. 5,* 199 S.W. 644, 650 (Tex.Civ.App.—Dallas 1917, writ ref'd); *Southland Life Insurance Co. v. Egan,* 126 Tex. 160, 86 S.W.2d 722, 723 (1935).

It is undisputed that prior to the purchase of their lot the Greers did not have any discussions with Mr. Allen, Mr. Buie or any other official or employee of Placemaker regarding the use of Lot 1, Block 1019, and that the statement that said Lot 1 would remain undeveloped in its natural state was made only by Mike Day and/or Malinda Lenhart. There is no evidence that Mike Day and/or Malinda Lenhart were authorized by Placemaker, Allen or Buie to represent to the Greers that Lot 1 would remain undeveloped in its natural state, and there is no evidence that Placemaker, Allen or Buie had any knowledge that Day and/or Lenhart had made such representation to the Greers. Mrs. Lenhart testified that she "inferred" Lot 1 would remain undeveloped from conversations she had with Mike Day but that she didn't recall ever having a conversation to that effect with Mr. Allen or Mr. Buie. The uncontroverted testimony of Mike Day, Malinda Lenhart and Robert Allen, President of

Placemaker, establishes that Mike Day Realty was authorized only to market newly developed lots in Huntington Park South and to offer these lots for sale at a 4% realtor's commission. The testimony of Mike Day reflects that the statements he made to the Greers and/or Mrs. Lenhart were based on his own perceptions, understandings and assumptions rather than on any authorization from Placemaker or its representatives.

In regard to the "common area" notation which he placed on the plat, Day testified in part:

Q. What representations were made to you by Mr. Allen or Mr. Buie as to the use of this land that's denoted as a common area, Lot Number 1?

A. A common area is, let's assume that that verbiage is mine, it is my fault. A common area might imply by common ownership. That was never conveyed to me and I don't believe we conveyed that to the many various customers that we sold those lots to.

* * * * * *

It was my understanding and perception that that area was not going to be developed.

* * * * * *

Q. All right. When you say it was not going to be developed, what does that mean?

A. Perhaps I should say further developed, because there were developments required of the developer. They had to concrete the creek way as one of the stipulations of the—developing the subdivision. It was our understanding, my understanding, which I'm sure I conveyed to Mrs. Lenhart that there would be no houses erected on this Lot 1, due, generally, to the fact that it is a creek and right-of-way for a future street on the western edge.

Q. Mr. Allen nor Mr. Buie nor anyone else at Placemaker ever represented to you that these would be common areas?

A. Not in the classic usage of that term, no, sir.

Q. Did Mr. Allen or Mr. Buie or anyone else with Placemaker refer to that area as 'green belt'?

A. I'm sure that at some point in our conversation it was ereferred [sic] to as a green belt.

Q. But they never authorized you to represent to prospective customers that this was a common area that anyone would have a right to use it or have some rights or privileges in it for any purpose?

A. They didn't authorize that and we didn't represent that.

* * * * * *

Q. So, in other words, you're saying there's a good chance that it would decrease the value of the house for something to be constructed on such a lot that would be created?

A. I don't believe I've said that. All I can honestly say is that the circumstances do change. The Greers bought the lot under my—under the same understanding that I had at the time that there would be nothing there except perhaps a street. Now the possibility of a house does change those facts. I can only—I could only speculate as to value. There could be a building erected there that would, in fact, enhance the value of everything in the neighborhood, but it would affect the view, the use that the Greers have anticipated on this particular lot.

Q. ... Would it affect the representations upon which they bought their lot?

A. Yes, sir.

Q. Would those representations have, indeed, been changed?

A. They would have been changed. The information under which they purchased the lot, the existence of a house on that site was not one of the possibilities as we understood it.

THE COURT: As represented to you by Pacemaker and their employee—their representative?

THE WITNESS: Yes, sir.

THE COURT: As represented by them?

THE WITNESS: Judge, as perceived by me. I'm unable to—you know, I can't specifically state that I was told those things, but years of looking at plats and you look at a street easement and a drainage easement, and you just know that there's no—if those things continue to exist there, there's just no way that—to build a house on it.

Q. Now, you said 'in a classic sense,' there was no representation to you by Mr. Allen or Mr. Buie that this was a common area. What do you mean, 'in a classic sense'?

A. Well, 'common area' would be a circumstance of common to a condominium development, for example, where there be some sort of fee assessed to all the owners that they might own in common or jointly a park, a green belt, a swimming pool, a club house or something. None of those representations were made, and my choice of the words, 'common area,' it was evident to me today was a very poor choice to put on the plat. The inference or the perception that I had was that that area was used for water to run off to and to grow willow trees and grass and that the other part down here was, in fact, a street easement required by the city engineers to provide future access to—

\* \* \* \* \* \*

Q. And, so, when you used the word, 'common area,' you're using it in a very particularized sense that, is that correct, not a classic sense but in a special sense for this particular subdivision?

A. In this particular sense, and we told no one that they would have common ownership or usage; it's just simply a visual barrier more than anything else between the backs of particular lots. It's a pretty view. It's a creek bottom.

■ It is the established law in this state that one dealing with a real estate broker or agent has a duty to inquire into his authority. *Huginnie v. Loyd,* 483 S.W.2d

696, 701 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.); *Bugh v. Word,* 424 S.W.2d 274, 279 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.). In the case at bar, the Greers made no inquiry of Placemaker, Allen or Buie as to whether Lot 1, Block 1019 would remain undeveloped in its natural state as represented by the realtors. Mr. Greer testified that, prior to purchasing his lot, he did not have any discussions with Mr. Allen, Mr. Buie or any other official or employee of Placemaker about the "use of the property or anything else"; that prior to purchasing his lot he did read a copy of the deed restrictions and dedication agreement covering the subdivision; that although there was no reference to a "common area" in the deed restrictions, he did not question Mrs. Lenhart "about that." Mr. Greer then testified:

Q. Were you concerned about the fact that the declaration of restrictions covering the property did not mention this common area that has been identified to you on a map as a common area that you had some rights in?

A. No, there was no question in my mind about it.

Q. There was no question in your mind about it?

A. About the green area.

Q. Even though it was not mentioned in the official restrictions covering the property?

A. No, because I didn't really see how he could erect a house in a creek bottom, and I didn't really feel like there was any possibility that would occur.

Q. That was your opinion that you just felt that it wouldn't happen?

A. That's why I—

Q. So, you took your chances?

A. That's why I assumed that it wasn't necessary to question it.

■ A real estate agent is a special, rather than a general, agent, and, as such, has no power to bind his principal, the owner, by his unauthorized representations as to the property. *Loma Vista Development Co. v. Johnson,* 142 Tex. 686, 180 S.W.2d 922,

924 (1944); *Doria v. Suchowolski,* 531 S.W.2d 360, 365 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.). It is clear to us that Mike Day and Mrs. Lenhart were special agents whose authority was limited to showing the property and finding a purchaser, and that they had no authority to consummate the sale. In *Loma Vista, supra* 180 S.W.2d at 924, the court said:

> "... since the buyer must deal directly with the seller in closing the transaction, he has an opportunity, before he accepts the deed, *to inquire of the seller as to the truth of any representations made by the broker.* As said in *Lansing v. Coleman, N.Y.,* 58 Barb. 611, 619, 'Common prudence, and justice to the vendor, would seem to demand, that the purchaser should go to him for the facts which are to influence the purchase.' (Emphasis added.)

We hold that Day and Lenhart had no implied or apparent authority to make representations that Lot 1 would remain undeveloped, and that as a matter of law the appellants are not liable for damages for such misrepresentations, since they were not expressly authorized by appellants and were not known to them before Placemaker's deed was delivered to the Greers. *Loma Vista, supra.* Appellees have failed to prove "probable right" and "probable injury." Appellants' first and second points are sustained.

The judgment of the trial court is reversed and the temporary injunction is dissolved.