# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00197-CV

**Richard Joseph, Appellant**

**v.**

**Tory James, Angela James, Tony Cussimanio and Robert Bullara, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-06-002281, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant Richard Joseph sued appellees Tory and Angela James, Tony Cussimanio, and Robert Bullara for breach of contract and real estate fraud under chapter 27 of the business and commerce code. The trial court granted appellees' motion for summary judgment and denied Joseph's cross-motion for partial summary judgment. In this appeal, Joseph argues that the trial court erred in granting appellees' motion for summary judgment and denying his cross-motion. We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 8, 2006, the Jameses, through their real estate agent, Cussimanio,[1] faxed an offer for the purchase of Joseph's home to his real estate agent, Susan Griffith. The offer, in

---

[1] Appellee Bullara is Cussimanio's sponsoring real estate broker.

the amount of $1,875,000, was presented on Texas Real Estate Commission form TREC 20-6, "One to Four Family Residential Contract (Resale)." The Jameses initialed each page and signed in accordance with the blanks on the form. The next day, Griffith informed Cussimanio that Joseph would not consider an offer less than $2,000,000. After consulting with the Jameses, Cuissimanio drew a line through the figures on the first page of the form, changing the total sales price to $2,000,000. The Jameses did not initial these changes or re-sign. Upon receipt of the modified form, Joseph made several changes, including raising the sales price to $2,195,000.[2] Joseph initialed each change, and on February 10, Griffith sent the form back to Cussimanio.

On February 12, after consulting with the Jameses, Cussimanio again drew a line through the figures on the first page of the form, changing the total sales prices to $2,100,000, and the financed portion of the sales price from $1,000,000 to $1,100,000. Again the Jameses did not initial these changes or re-sign. Cussimanio attached the form to an email to Griffith stating: "[the Jameses] love the home and are countering at $2,100,000.00 with no other changes to your client's counter. Please see the attached counter offer. Thanks again, Tony."[3] Griffith subsequently called Cussimanio and made an oral counter-offer increasing the sales price to $2,125,000 and conveying various household equipment and personal property.[4] Two days later, without notifying Griffith,

---

[2] In addition, Joseph changed the obligation to pay for a survey from the seller to the buyer, the time for making objections to the title commitment, the closing date, and the time period of the termination option. Joseph also added a Seller's Temporary Residential Lease so that he could remain in the property for two days after closing.

[3] We will refer to these documents as the "February 12 form" and the "February 12 email."

[4] Although Griffith classifies this conversation as an oral counter-offer, Joseph contends that it was not a counter-offer for $2,125,000 for the house and instead was a suggestion that the Jameses purchase his personal property for $25,000. Joseph asserts that he intended this transaction to be "a completely separate side deal, not part of any offer or counter-offer for the sale of the house itself."

2

who was out of town, Joseph initialed the February 12 form. At Joseph's request, Griffith's assistant sent Cussimanio an email advising him that Joseph "accepts your clients offer of $2,100,000 for his home."

Upon receipt of Joseph's purported acceptance, Cussimanio called Griffith and told her that it was his understanding that there was no binding contract, and that when he sent the February 12 form to the Jameses for their signature and initials, the Jameses decided that they were not willing to move forward with the terms. After this conversation, Griffith sent the following email to Joseph:

> Regarding the conversation with Tony Cussimanio today when I returned his call:
>
> Tony said that the James were only willing to pay $2,000,000—no more. I told him that I had been working on you to get you to $2,100,000 and you finally sent back the counter to Cathy with instructions to send on to Tony without my knowledge. So I was just as surprised as Tony was that you finally came down to $2,100,000. Tony told me today that the James would not go that high and I told him that I thought we might have a deal because we received Tony's email on Sunday to say that the James's would go that high with no changes to the counter.

At Joseph's request, Griffith emailed Cussimanio to ask about the status of the contract. Cussimanio responded that the Jameses "did not sign or agree to the contract," and that he wrote in the new sales price of $2,100,000 and loan amount of $1,100,000. He stated that he did not have the Jameses' permission to send these changes to Griffith and that "[t]he counter proposal was intended to be faxed to the James's for their signature and was mistakenly faxed to Susan's office fax number." He continued:

3

Sorry for the confusion. I thought this was understood when you and I spoke about The James's not sending back the signed counter. I mentioned to you that . . . as soon as I heard back from them I would let you know where they stood with the counter that was sent to them. I also mentioned to Susan that I was going to produce a cleaner copy of the Buyer's counter offer to work with and thought we all understood that we did not have a signed counter from The James's.

Shortly thereafter, Joseph sued appellees for breach of contract, negligent misrepresentation, tortious interference with contract, and real estate fraud under chapter 27 of the business and commerce code.[5] Appellees pled the affirmative defenses of statute of frauds and failure to mitigate,[6] and filed a counterclaim seeking a declaration that there is no enforceable contract between Joseph and the Jameses. Appellees moved for summary judgment asserting that after the Jameses made their initial offer to purchase Joseph's home for $1,875,000, they never again signed the form faxed and emailed between the real estate agents, nor did they initial the changes made by Joseph or Cussimanio, thus there was no contract that satisfied the statute of frauds. Joseph filed a cross-motion for partial summary judgment, contending that he was entitled to judgment as a

---

[5] Joseph makes no arguments on appeal regarding his negligent misrepresentation or tortious interference claims.

[6] Joseph argues that appellees waived several affirmative defenses, including special agency, by pleading them for the first time in response to Joseph's cross-motion for partial summary judgment. The issue of Cussimanio's authority as a special agent is encompassed in the analysis of whether there was a contract signed by the Jameses or someone authorized to sign for them that satisfies the statute of frauds. Because we hold that the trial court correctly granted summary judgment on appellees' statute of frauds defense, we do not reach the issue of waiver of these affirmative defenses.

matter of law on his breach of contract claim against the Jameses. The trial court granted appellees' motion and denied Joseph's cross-motion without specifying the grounds on which it relied.[7]

On appeal, Joseph argues that the trial court erred in granting appellees' motion for summary judgment and denying his cross-motion for partial summary judgment because (1) there was an enforceable contract that satisfied the statute of frauds, and (2) he has a valid claim for real estate fraud under chapter 27 of the business and commerce code.

## STANDARD OF REVIEW

Summary judgment is proper when there are no disputed issues of material fact, and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A defendant who conclusively negates at least one essential element of the plaintiff's cause of action is entitled to summary judgment. *Little v. Texas Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). We review the trial court's summary judgment de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When, as here, both parties move for summary judgment on overlapping issues and the district court grants one motion and denies the other, we review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment that the district court should have

_____

[7] After appellees filed their motion for summary judgment, Joseph amended his petition to add Cussimanio's agency, No Limit Realty, as a defendant and to add a Deceptive Trade Practices Act ("DTPA") claim against Cussimanio, Bullara, and No Limit. Cussimanio, Bullara, and No Limit subsequently filed a motion for summary judgment on these claims, which the trial court granted. No Limit Realty is not a party to this appeal and Joseph makes no argument on appeal regarding his DTPA claim.

rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004). "When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000) (citations omitted).

## DISCUSSION

### *Statute of Frauds*

Joseph contends that the trial court erred in granting appellees' motion for summary judgment on their statute of frauds defense because the February 12 form in which Cussimanio changed the sales price to $2,100,000 was a valid counter-offer, despite the fact that the Jameses did not initial Cussimanio's changes or re-sign.

To be enforceable, a contract for the sale of real estate must comply with the statute of frauds. Tex. Bus. & Com. Code Ann. § 26.01(b)(4) (West 2009); *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978). Section 26.01 of the business and commerce code provides:

> (a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is
>
> > (1) in writing; and
> >
> > (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.
>
> (b) Subsection (a) of this section applies to:
>
> . . .
>
> > (4) a contract for the sale of real estate . . . .

6

Tex. Bus. & Com. Code Ann. § 26.01. Whether a contract meets the requirements of the statute of frauds is a question of law. *Bratcher v. Dozier*, 346 S.W.2d 795, 796 (Tex. 1961); *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 264 (Tex. App.—Austin 2002, no pet.).

The parties do not dispute that Cussimanio modified the sales price and financed amount on the February 12 form or that the Jameses did not initial the changes or re-sign. Joseph contends that despite the requirement that contracts for the sale of real estate be signed by the person to be charged or by someone lawfully authorized to sign for him, the Jameses' initials or signatures were not required because: (1) Cussimanio, as the Jameses' agent, had the authority to make a binding offer on their behalf, (2) a contract for the sale of real estate may consist of multiple documents, and the Jameses adopted the signature and initials from their initial offer, (3) numerous cases have upheld real estate contracts without all the principals' signatures, and (4) even if the contract was not valid, the Jameses ratified it. We will address each of Joseph's arguments in turn.

Joseph argues that Cussimanio, as the Jameses' agent, had the authority to make a binding offer on their behalf. A real estate agent or broker is not a general agent but, instead is a special agent whose authority is generally limited to showing property and, in the case of a seller's agent, finding a purchaser, and does not include the authority to consummate a sale. *Loma Vista Dev. Co. v. Johnson*, 180 S.W.2d 922, 924 (Tex. 1944); *Bugh v. Word*, 424 S.W.2d 274, 279 (Tex. Civ. App.—Austin 1968, writ ref'd n.r.e.). Such authority may not be extended beyond those powers expressly given by the principal. *Placemaker, Inc. v. Greer*, 654 S.W.2d 830, 834 (Tex. App.—Texarkana 1983, writ dism'd); *Mecom v. Gallagher*, 213 S.W.2d 304, 306 (Tex. Civ.

App.—El Paso 1947, no writ).  It follows that one dealing with a real estate broker or agent has the duty to inquire into his authority.  *Placemaker*, 654 S.W.2d at 834; *Bugh*, 424 S.W.2d at 279.

Joseph has presented no evidence that the Jameses authorized Cussimanio to make a binding offer on their behalf, nor that Joseph inquired into Cussimanio's authority to make a binding offer.[8]  The Jameses do not dispute that they gave Cussimanio permission to make the changes to the form; however, they did not give Cussimanio permission to send the form to Griffith, and it was their understanding that the offer would not be binding until they initialed the changes.[9]  This is

---

[8]  There is some evidence that Griffith inquired as to the lack of signatures on the contract attached to Cussimanio's February 12 email, and that Cussimanio's response indicated that he did not have the Jameses' permission to make a binding counter-offer.  Appellees presented an email from Cussimanio to Joseph stating:

> After I sent the email to Susan with my client's counter on the 12th, she immediately called me and told me that there were no signatures on the counter from my client. I then told her that I was preparing a cleaner version with all applicable changes and sending it to my client for their approval and signatures, and that I would fax it to her as soon as I received it.

[9]  The following exchange took place at Tory James's deposition:

Q.    Did you tell Mr. Cussimanio to offer 2.1 million dollars?

A.    Yes

Q.    Okay.  Did you understand that once he made that offer, if Mr. Joseph said "I accept," that you have a contract?

A.    No.

. . . .

Q.    Well, what did you think you were doing when you told Mr. Cussimanio that it was okay to offer 2.1 million dollars?

A.    Just going back and forth.

consistent with the authority the Jameses granted Cussimanio in their Buyer Representation Agreement, which includes among the broker's obligations "assist[ing] Client in negotiating the acquisition of property in the market area," but does not include making a binding offer that consummates the sale. It is inapposite that Cussimanio's email notes that the Jameses "are countering at $2,100,000," because without a contract reflecting this counter-offer signed by the Jameses, this is nothing more than a notification to Griffith of his clients' intent to make such a counter-offer in the future.

Joseph next contends that the statute of frauds has been satisfied because a contract for the sale of real estate may consist of multiple documents as long as they contain the essential terms of the transaction. He argues that the Jameses' initial offer, in combination with Cussimanio's February 12 email, constituted an enforceable contract when it was signed and accepted by Joseph.

. . . .

Q.    All right. And you authorized Mr. Cussimanio to offer [different sales prices] to Mr. Joseph.

A.    Yeah, I—Yes.

Q.    And what did you think would happen if one of those numbers was acceptable to Mr. Joseph?

A.    Just like—Just like Mr. Cussimanio did, send me the contract and I sign it and send it back to Mr. Joseph and he signed it and we agree on it.

Q.    All right. So you did not think that if Mr. Joseph accepted one of these other offers on another form that it would be a con—binding contract.

A.    I—I would think my signature would have to be on it for it to be a contract.

9

He also contends that the Jameses adopted the signatures and initials from their initial offer by continuing to send "counter offers" on the same form. These arguments fail for several reasons.

Agreements executed at the same time, with the same purpose, and as part of the same transaction are construed together. *In re Prudential Ins. Co.*, 148 S.W.3d 124, 135 (Tex. 2004). In fact, if two or more written instruments pertain to the same transaction, they may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). In appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument. *Id*. Here, however, the documents Joseph seeks to construe as one contract—the Jameses' initial offer and Cussimanio's email—were not executed at the same time, for the same purpose, or even by the same parties. Reading Cussimanio's email and the Jameses' initial offer together indicates nothing more than the Jameses' intent to make their initial offer and Cussimanio's understanding that as of February 12 they planned to make a counter-offer.[10] Cussimanio sending "counter offers" that included the Jameses' signatures and initials from the initial offer cannot be construed as an adoption of those signatures and initials with respect to any new offer. A signature made by someone else in the presence or absence of the principal with or without his request may be adopted such that the instrument to which it is signed becomes

---

[10] In any event, it appears Joseph rejected the Jameses' initial offer with his February 10 counter-offer changing the sales price and other material terms. *See KVET Broad. Co. v. Tiemann*, 447 S.W.2d 457, 460 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.) (holding that "a counter-offer by the offeree, relating to the same subject matter as the original offer, is a rejection of the original offer, unless the offeree at the same time states in express terms that he is still keeping the original offer under consideration").

binding. *Mondragon v. Mondragon*, 257 S.W. 215, 216-17 (Tex. 1923) (contract written and signed by grantee was deemed adopted by grantor when it "was prepared in the presence and under the direction of the grantor, was delivered by him, and the consideration paid him therefor").  However, Joseph has presented no evidence that the Jameses even knew that Cussimanio was sending Griffith the February 12 "counter-offer" with their original signatures and initials, let alone evidence that they adopted them for purposes of a counter-offer.

Joseph next asserts that the February 12 form satisfies the statute of frauds because numerous cases have upheld real estate contracts without all of the principals' signatures.  However, the cases he cites involve circumstances distinct from the present case.  In two cases, although the principal did not sign the "contract," he or she signed some document containing the terms of the contract.  *See Key v. Pierce*, 8 S.W.3d 704, 708 (Tex. App.—Fort Worth 1999, pet. denied) (holding that statute of frauds was satisfied even though contract was not in writing, because party to be charged had signed notice of sale, which in combination with deed of trust and cash tendered by buyer, furnished evidence of contract and its essential terms); *Libby v. Noel*, 581 S.W.2d 761, 763-64 (Tex. Civ. App.—El Paso 1979, writ ref'd n.r.e.) (upholding specific performance even though contract was only signed by seller when seller signed purchase agreement and buyer signed promissory note, both of which contained terms of contract, were executed on same day, and referred to each other).  Joseph has presented no evidence that the Jameses signed a document containing the sales price he seeks to enforce.  Another case that Joseph cites does not address the lack of a principal's signature altogether, but instead an agent's authority to sign on the principal's behalf.  *See Little v. Clark*, 592 S.W.2d 61, 63-64 (Tex. Civ. App.—Fort Worth 1979, writ ref'd n.r.e.)

11

(holding that wife had authority to sign former husband's name to contract for sale of homestead). An agent's signature may be sufficient to bind the principal *if he has authority*, but as noted above, Cussimanio did not have authority to sign on the Jameses' behalf. And, while one of the cases holds that a written instrument signed by one party and expressly accepted orally by the other satisfied the statute of frauds, in this case, the Jameses did not expressly orally extend the terms in the February 12 form as a counter-offer. *See Ford v. Culbertson*, 308 S.W.2d 855, 866 (Tex. 1958) (holding that agreement for sale of property "had the character of a written instrument" and satisfied statute of frauds when contract was reduced to writing and signed by one party but accepted orally by other).

Finally, Joseph asserts that even if the contract was not valid, the Jameses ratified it. Joseph argues that Cussimanio's sending the February 12 form to Griffith constitutes ratification by the Jameses. Ratification is the adoption or confirmation by a person of a prior act that did not then legally bind him and that he had the right to repudiate. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 678 (Tex. 2000). Joseph does not provide evidence of any subsequent affirmative act or acknowledgement of a contract by the Jameses, thus, his ratification argument fails.

Since there is no written agreement signed by the Jameses, there is no enforceable contract that satisfies the statute of frauds. We overrule Joseph's challenge to the trial court's judgment on this basis.

*Real Estate Fraud*

Joseph also argues that the trial court erred in granting summary judgment to appellees as to his real estate fraud claim and asks this Court to remand this cause of action for trial. Section 27.01 of the business and commerce code provides:

> (a) Fraud in a transaction involving real estate . . . consists of a
>
> > (1) false representation of a past or existing material fact, when the false representation is
> >
> > > (A) made to a person for the purpose of inducing that person to enter into a contract; and
> > >
> > > (B) relied on by that person in entering into that contract . . . .

Tex. Bus. & Com. Code Ann. § 27.01 (West 2009).

Joseph could not have relied on any false representation in entering into a contract because there is no enforceable contract. In addition, the statute of frauds bars a fraud claim to the extent that the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the statute of frauds. *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001). This is because "the Statute exists to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in a writing signed by the parties. But that purpose is frustrated and the Statute easily circumvented if a party can use a fraud claim essentially to enforce a contract the Statute makes unenforceable."[11] *Id*. Because there is not an enforceable contract

---

[11] The statute of frauds may not bar a common-law fraud claim to the extent the plaintiff seeks out-of-pocket damages incurred in relying upon the defendant's alleged misrepresentations because "[w]ith respect to such damages, [the plaintiff] is not attempting to enforce the otherwise

between Joseph and the Jameses, the trial court did not err in granting summary judgment for the Jameses on this ground. *See Little*, 148 S.W.3d at 381 (defendant who conclusively negates at least one of essential elements of plaintiff's cause of action is entitled to summary judgment).

## CONCLUSION

Because there is no enforceable contract that satisfies the statute of frauds, the trial court did not err in granting appellees' motion for summary judgment and denying Joseph's cross-motion for partial summary judgment. Accordingly, we affirm the judgment of the trial court.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: November 6, 2009

---

unenforceable contract. . . . These kinds of damages are not part of the benefit of any alleged bargain between the parties." *Haase v. Glazner*, 62 S.W.3d 795, 799-800 (Tex. 2001). We need not address the type of damages Joseph seeks because statutory real estate fraud requires the existence of a contract.